Louis E. **UNDERHILL** and Director, Office of Workers' Compensation Programs, United States Department of Labor, Petitioners/Cross-Respondents,

v.

**PEABODY COAL COMPANY** and Old Republic Insurance Company, Respondents/Cross-Petitioners.

**Nos. 81–2285, 81–2290 and 81–2393.**

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1982.

Decided Aug. 27, 1982.

Roger M. Siegel, Washington, D. C., for petitioners/cross-respondents.

W. C. Blanton, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for respondents/cross-petitioners.

Before BAUER, Circuit Judge, NICHOLS,* Associate Judge, and WOOD, Circuit Judge.

BAUER, Circuit Judge.

Louis E. Underhill filed a black lung benefits claim on May 25, 1977. The Office of Workers' Compensation Programs approved his claim on October 16, 1978, and notified Peabody Coal Company (Peabody), the responsible coal mine operator. After Peabody disputed the findings supporting Underhill's benefits claim, an administrative law judge (ALJ) reviewed the matter and upheld Underhill's award. The ALJ ruled that Underhill suffered from totally disabling pneumoconiosis because the results of Underhill's pulmonary function tests fell below the minimum level set by 20 C.F.R. § 727.203(a)(2), which creates a presumption of pneumoconiosis in such cases. In the ALJ's opinion, the pneumoconiosis presumption was not rebutted.

Unsatisfied with this decision, Peabody and its insurer, Old Republic Insurance Company (Old Republic), sought review by the Benefits Review Board (Board). On June 17, 1981, the Board reversed the ALJ's award and denied Underhill's benefits, holding that the pneumoconiosis presumption had been rebutted and that the "aggravation theory" created by the Secretary of Labor and applied by the ALJ was unconstitutional. Underhill now petitions this court to reverse the Board's determination, as does the Director of Workers' Compensation Programs (Director) in No. 81–2290. Peabody and Old Republic cross-petition for review in Nos. 81–2391 and 81–2393, respectively. We affirm.

I

A

Concern for the health and safety of the nation's coal miners, together with the inad-

---

* The Honorable Philip Nichols, Associate Judge of the United States Court of Claims, is sitting by designation.

equacy or absence of state workers' compensation coverage for such laborers, prompted Congress to enact the Federal Coal Mine Health and Safety Act of 1969 (FCMHSA), 30 U.S.C. § 801 *et seq.* (1970), *as amended by* Federal Mine Safety and Health Amendments Act of 1977, 30 U.S.C. §§ 901–945 (1976, Supp. I 1977 & Supp. II 1978). In passing this legislation, Congress sought to prevent death and serious physical harm by improving working conditions and practices in the nation's mines. To further these important ends, Congress adopted or authorized the promulgation of various regulatory standards, exemplified by the limitation on the permissible amount of dust in the ambient air of coal mines, found in Title II of the FCMHSA, 30 U.S.C. § 841 *et seq.* (1970), and the requirements for illumination of coal mines, prescribed by 30 C.F.R. §§ 75.200–75.200–14 (1980). Congress also authorized powerful sanctions to ensure compliance with these standards, such as the peremptory mine closure provisions of sections 104(a) and 104(c) of the FCMHSA, 30 U.S.C. §§ 814(a) & (c) (1970). *See generally* Moriarty & Pierce, *The Federal Mine Safety and Health Amendments Act of 1977: Closure Encounters of the Third Kind*, 80 W.Va.L.Rev. 429 (1978).

In addition to imposing safety and health regulations on the coal industry, Congress established a compensation program embodied in Title IV of the FCMHSA, 30 U.S.C. §§ 901–960 (1970, Supp. V 1975) (amended 1978). Title IV provides benefits to disabled miners and the survivors of deceased miners when the miner was disabled or killed by coal workers' pneumoconiosis, an occupational disease more commonly known as black lung. Because the issues in this appeal concern Title IV and certain regulations thereunder, we detail below pertinent parts of the statutory and regulatory framework of Title IV.

**B**

Title IV has been amended twice since 1969, first by the Black Lung Benefits Act of 1972, Pub.L.No. 92–303, and 86 Stat. 150, and more recently by the Black Lung Benefits Reform Act of 1977, Pub.L.No. 95–239, 92 Stat. 95. Prior to the 1972 amendments, a large number of black lung claims filed before July 1, 1973 (Part B claims)[1] were denied under the adjudication procedures and standards of the Social Security Administration (SSA). The 1972 amendments were intended to alleviate the SSA's overly restrictive approach by liberalizing the eligibility criteria, expanding coverage, and extending the time period for recovery. To implement the 1972 Congressional mandate, the SSA promulgated medical standards and adjudicatory rules commonly termed the "interim criteria" or "interim presumption."[2] *See* 20 C.F.R. § 410.490 (1980). The frequency of claimant recovery increased greatly under this new, more liberal interim presumption.

Despite these improvements, problems persisted for claims filed after December 31, 1973 (Part C claims). Under the 1972 amendments, responsibility for Part C claims shifted to the Department of Labor (DOL), which was to process such claims pursuant to an adjudication procedure comporting with the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* It soon became apparent that the DOL's claims approval rate was significantly lower than that of the SSA, largely because the SSA's liberal interim presumption was inapplicable to DOL cases. *See* Solomons, *A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of Its Unresolved Issues*, 83 W.Va.L.Rev. 869, 873 (1981)·(hereinafter Solomons). Because the need for additional legislative revision was evident, Congress responded with the Black Lung Benefits Reform Act of 1977, Pub.L.No.95–239, 92 Stat. 95.

---

1. Sections 411 through 415, 30 U.S.C. §§ 921–925, govern Part B claims. Section 415 establishes standards for "transition period" claims filed between July 1, 1973 to December 31, 1973. 30 U.S.C. § 925.

2. Permanent criteria are codified at 20 C.F.R. §§ 410.401–.476 (1980).

The Congressional intent behind the 1977 reform legislation was the same as that underlying the 1972 amendments: to expand the coverage contemplated by the original act and to liberalize claim awards by removing certain eligibility restrictions from the program. As amended, section 402(f)(2), 30 U.S.C. § 902(f)(2), authorized the Secretary of Labor to adopt new medical and evidentiary criteria for determining total disability or death due to pneumoconiosis. The DOL's new criteria, however, was to be no more restrictive than the SSA's interim presumption. *Id.* The 1977 amendments also broadened the term pneumoconiosis, which is now defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b).[3] In addition, financial responsibility for Part C black lung claims passed from the federal government, which pays Part B claims, to the miner's coal mine employer or its insurance carrier, unless an approved state workers' compensation programs exists. *Id.* § 932(a), (b). Thus, the United States becomes liable for Part C claims only when no financially responsible coal mine operator or insurer can be found. *Id.* at § 934.

Following the statute's 1977 modifications, the DOL issued its regulations, including its interim criteria or presumption, found at 20 C.F.R. § 727.200 *et seq.* (1980). The regulations provide an expanded definition of pneumoconiosis that encompasses respiratory or pulmonary impairments merely "aggravated by" dust exposure in coal mine employment.[4] 20 C.F.R. § 727.202. In addition, the regulations' new interim presumption is less stringent than that of the SSA. Basically, the DOL version provides that after 10 years of coal mine employment a miner is presumed to be totally disabled by or to have died from pneumoconiosis if one of several requirements is satisfied: (1) a chest x-ray, biopsy, or autopsy establishes the existence of pneumoconiosis; (2) ventilatory studies establish the presence of a chronic respiratory or pulmonary disease; (3) gas studies demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood; (4) other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment; or (5) in instances where no medical evidence is available, the affidavit of a deceased miner's survivor or other persons with knowledge of the miner's physical condition demonstrates the presence of a totally disabling respiratory or pulmonary impairment. 20 C.F.R. § 727.203(a)(1)–(a)(5).

Subsections (b)(1) through (b)(4) of the regulations, 20 C.F.R. § 727.203(b)(1)–(b)(4), list the types of evidence which rebut the DOL presumption, including a showing that: (1) the miner is doing or is able to do either his usual coal mine work or comparable and gainful work; (2) the miner did not or does not have pneumoconiosis; or (3) the miner's total disability or death did not arise in whole or in part out of coal mine employment. The DOL's pneumoconiosis definition, interim presumption, and rebuttal standards are the subject of this appeal.

## II

Louis Underhill worked as a coal miner for 34 years, the last 15 of which were spent in the employ of Peabody. Although he

---

**3.** The statute previously defined pneumoconiosis as "a chronic dust disease of the lungs arising out of employment in a coal mine."

**4.** The complete text of 20 C.F.R. § 727.202 reads:

For the purposes of the act, "pneumoconiosis" means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes, but is not limited to, coal workers' pneumo-coniosis, anthracosilicosis, anthracosisanthro-silicosis, massive pulmonary fibrosis, progressive massive fibrosis silicosis, or silicotuberculosis arising out of coal mine employment. For purposes of this definition, a disease "arising out of coal mine employment" includes any chronic pulmonary disease resulting in respiratory or pulmonary impairment significantly related to, or aggravated by, dust exposure in coal mine employment.

labored in underground mines for his first 9 years, the balance of his coal mine employment experience occurred in strip mines. In the hearing before the ALJ, Underhill testified that over the course of his career he performed various mining tasks, many of which subjected him to substantial though varying amounts of coal dust. Underhill also testified that he last served Peabody as an oiler on a drag line to avoid the severe dust conditions accompanying his previous positions.

Underhill next described his poor health and its adverse impact on his private life. For example, he noted his inability to walk distances, his suffering from coughing, gagging, and dizziness, and his sleeping difficulties. Underhill's health problems also curtailed or ended many of his leisure activities and forced him to seek the care of a physician.

In addition to the foregoing testimony, Underhill introduced as medical evidence two pulmonary studies pursuant to 20 C.F.R. § 727.203(a)(2), one conducted by Doctor J. Frank W. Stewart on January 16, 1976, the other conducted by Doctor Kenneth Wilhelmus on August 9, 1977. Doctor Stewart reported that Underhill's forced expiratory volume (FEV) [5] of 2.05 and maximal voluntary ventilation (MVV) [6] of 82 were below the regulation's minimum levels of 2.4 and 96, respectively, set for persons in Underhill's category. Doctor Wilhelmus reached a similar conclusion, recording Underhill's FEV at 2.14 and his MVV at 57, both below their respective minimum levels of 2.5 and 100, as he calculated them.[7]

Based on these ventilatory studies and Underhill's more than ten years of coal mine employment, the ALJ ruled that Underhill had satisfied the DOL interim criteria and was therefore presumed to be totally disabled due to pneumoconiosis.[8]

The ALJ then turned to the rebuttal evidence offered by Peabody and Old Republic. Doctor Richard M. Nay reviewed Underhill's history of back problems, general health, chest x-rays, and ventilatory test results before deciding that Underhill was neither partially nor totally disabled as a result of pneumoconiosis. In Doctor Nay's opinion, there was no evidence that Underhill's chronic obstructive lung disease had been caused or aggravated by exposure to coal mine dust.

The ALJ recognized that Doctor Nay's opinion rebutted the interim presumption, but refused to give it credence because he considered it inadequately explained and because Doctor Nay had used ventilatory standards which conflicted with those found in the regulations. The portion of Doctor Nay's report that dismissed coal dust as possibly having caused or aggravated Underhill's illness was unsubstantiated, according to the ALJ.

The ALJ also rejected a report by Doctor Wilhelmus. In his report Doctor Wilhelmus stated that Underhill suffered from chronic bronchitis and emphysema, both of which he thought were probably due to excessive and long-term smoking. His report noted that chest x-rays showed increased bronchi-

---

**5.** "The FEV measures in liters the volume of air which can be forcibly expelled from the lungs after maximum effort over a period of one second." Solomons, *supra*, 83 W.Va.L.Rev. at 879 n.33.

**6.** "The MVV or MBC measures, in liters, the total volume of air expelled over a period of one minute during repetitive maximal respiratory effort." Solomons, *supra*, 83 W.Va.L.Rev. at 879 n.34.

**7.** In its cross-petition, Peabody questions whether the quality standards of 20 C.F.R. § 727.206(a) were satisfied by Doctor Stewart's and Doctor Wilhelmus' ventilatory studies, an issue the Board did not address. We need not resolve this point in view of our holding, *infra*,

that Underhill's ventilatory studies, even if valid, were rebutted as a matter of law. Similarly, we do not decide the constitutional arguments raised in Peabody's cross-petition, which concern the DOL regulation's failure to distinguish between underground and surface miners, because Underhill would not recover benefits irrespective of our disposition of the surface-versus-underground miners question.

**8.** The ALJ noted that certain x-ray reports appearing in the record were negative for pneumoconiosis and therefore could not serve as a basis for invoking the interim presumption under 20 C.F.R. § 727.203(a)(1).

al markings and emphysema, but not pneumosilicosis. Doctor Wilhelmus concluded his report with the observation that Underhill did not have "black lung disease."

Despite these findings and conclusions, the ALJ discredited Doctor Wilhelmus' opinion because it did not purport to find on the basis of a reasonable degree of medical certainty that Underhill's chronic pulmonary impairment was due to smoking. In addition, the ALJ expressed doubt as to the opinion's validity because the phrase "black lung disease" was used in place of "pneumoconiosis" and because the report failed to "establish on the basis of a reasonable medical certainty that [Underhill's breathing] impairment did not arise from, or is not significantly related to, or was not aggravated by dust exposure in coal mine employment."

Finally, the ALJ found the report of Doctor Stewart unpersuasive. Doctor Stewart's opinion tracked those of Doctors Nay and Wilhelmus to the extent that it concluded Underhill suffered from chronic obstructive lung disease and asthma. It differed, however, in its conclusion that many years of underground coal mine employment had aggravated Underhill's lung condition. The ALJ pointed out that Underhill had only worked a few years in underground mines and that the opinion otherwise failed to rebut the presumption.

The Benefits Review Board, with one member dissenting, reversed the ALJ's decision. The Board held that the section 727.203(a)(2) presumption was rebutted as a matter of law pursuant to section 727.-203(b)(4). Specifically, the Board reasoned that the negative x-ray results combined with the doctors' opinions finding no pneumoconiosis were sufficient to rebut the pneumoconiosis presumption.

In its ruling, the Board viewed Doctor Wilhelmus' opinion that Underhill did not have "black lung disease" as a reasoned medical judgment which rebutted Underhill's ventilatory studies. The Board felt obliged to accept the clear, uncontradicted opinion of Doctor Wilhelmus because of his status as an occupational medicine specialist. The Board also noted that the ALJ had incorporated the "aggravation theory" contained in the DOL's definition of pneumoconiosis, 20 C.F.R. § 727.202, into the rebuttal provision of section 727.203(b)(4). The Board disapproved of the aggravation concept, relying on its decision in *Ovies v. Director*, BLR BRB No. 80–344 BLA (June 11, 1981), *vacated and remanded*, 681 F.2d 815 (4th Cir. 1982) (unpublished opinion). In addition, the Board believed it was improper for the ALJ to accept Doctor Nay's diagnosis of chronic obstructive lung disease but then to reject his opinion that Underhill did not have pneumoconiosis. An ALJ is not free to substitute his own expertise for that of a qualified physician, the Board concluded. This appeal followed.

### III

### A

We first turn to Underhill's contentions. Essentially, he claims that Peabody failed to rebut the regulatory presumption in the manner provided by 20 C.F.R. § 727.-203(b)(4). As Underhill correctly points out, the Board only considered the rebuttal method found in subsection (b)(4). Thus, our analysis is limited to whether the ALJ's rejection of Peabody's rebuttal under section 727.203(b)(4) was supported by substantial evidence and in accordance with law. *See Peabody Coal Co. v. Benefits Review Board*, 560 F.2d 797, 802–03 (7th Cir. 1977). We agree with the Board that it was not.

As noted above, Underhill's evidence apparently satisfied section 727.203(a) and therefore gave rise to a presumption that he was totally disabled due to pneumoconiosis arising out of his coal mine employment. As with any presumption, the effect is to shift the burden of going forward to the opposing party. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 27, 96 S.Ct. 2882, 2898, 49 L.Ed.2d 752 (1976). In this case Peabody met its burden by offering in rebuttal uncontroverted medical evidence.

Although the results of Underhill's ventilatory studies permitted him to invoke the pneumoconiosis presumption, the credible medical evidence before the ALJ consistently demonstrated that Underhill did

not suffer from black lung disease. For example, the three chest x-rays considered by the ALJ were negative for the existence of pneumoconiosis. While negative x-rays alone are not sufficient to rebut the presumption, *see Ansel v. Weinberger*, 529 F.2d 304, 310 (6th Cir. 1976), they assume some probative value when corroborated by other evidence such as expert medical testimony. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. at 32–33, 96 S.Ct. at 2900; *United States Steel Corp. v. Gray*, 588 F.2d 1022, 1028 (5th Cir. 1979).

■ Such corroborating expert testimony was present here. Doctor Wilhelmus, a recognized specialist in occupational medicine, unequivocally concluded that Underhill did not have black lung disease. His opinion was based on an examination of Underhill, familiarity with Underhill's past health, and a review of Underhill's chest x-rays, pulse, and respiratory rate under various conditions. We attach no significance to the fact that Doctor Wilhelmus referred to Underhill's disease as "black lung" rather than "pneumoconiosis." The word selection probably reflected his awareness of Underhill's benefits claim and the non-medical audience to whom his report was directed.

More importantly, unlike the reports by Doctors Wilhelmus and Stewart that mistakenly assumed Underhill had worked in underground mines for most or all of his life,[9] the report by Doctor Nay was correctly premised on a belief that Underhill was employed mainly above ground. His opinion was clear and uncontradicted: Underhill was "not totally or partially disabled as a result of pneumoconiosis, [and] there [was] no evidence that [his] chronic obstructive lung disease [was] caused or aggravated by exposure to dust in connection with his coal mine employment." These conclusions, based on a thorough physical exami-

nation, a ventilatory study, an electrocardiogram, and a review of chest x-rays, represented his expert judgment. Because these facts appeared in Doctor Nay's report, and with no credible evidence to the contrary in the record, the Board properly recognized that the ALJ erred in deeming Doctor Nay's opinion "unsubstantiated." The ALJ's position was unsupported by any evidence and thus was irrational in concluding that the pneumoconiosis presumption had not been rebutted.

■ We also agree with the Board that the "reasonable degree of medical certainty" standard advanced by the ALJ was improper. The purpose of this evidentiary test is to prevent speculation by the trier of fact, *see Kirschner v. Broadhead*, 671 F.2d 1034, 1039–40 (7th Cir. 1982), but it applies with equal force to both plaintiffs' and defendants' experts. Under the DOL's regulations, however, claimants are permitted to invoke the pneumoconiosis presumption simply on the basis of "the documented opinion of a physician exercising reasoned medical judgment." 20 C.F.R. § 727.-203(a)(4). Although Congress authorized the DOL to liberalize claims criteria, the DOL cannot establish a standard that treats the same proof differently depending on which side offers it. Put differently, if a doctor's opinion based on mere "reasoned medical judgment" is sufficiently probative for the purposes of claimants, it must be sufficiently probative for the purposes of mine operators and their insurers as well. Accordingly, Doctor Nay's opinion should be measured by the "reasoned medical judgment" test, which we believe it satisfied for the reasons already expressed.[10]

In sum, Peabody met its burden for rebuttal by introducing the uncontradicted medical opinion of Doctor Nay. Absent the support of a credible medical judgment to

---

**9.** Doctor Stewart acknowledged that Underhill did not suffer from pneumoconiosis, but suggested that Underhill's lung impairment was aggravated by exposure to coal dust. We do not rely on the reports of either Doctor Wilhelmus or Doctor Stewart as both improperly assumed long-term underground employment. We note, however, that they concur with Doc-

tor Nay's opinion in all respects save the "aggravation" observation by Doctor Stewart.

**10.** Underhill correctly notes that medical pneumoconiosis differs from "presumed" or "legal" pneumoconiosis in that the latter definition embraces dust-caused lung diseases other than pneumoconiosis. *See Ansel v. Weinberger*, 529 F.2d 304, 310 (6th Cir. 1976). But Doctor Nay's opinion also negated the possibility that

the contrary, the ALJ could not rationally conclude that Peabody failed to rebut the presumption.

### B

The Director urges us to consider the propriety of the Board's order invalidating the "aggravation concept" incorporated in section 727.202's definition of pneumoconiosis. In light of our disposition of this case on the basis of Doctor Nay's opinion, which precludes any finding that Underhill's lung impairment was aggravated by exposure to coal dust, we view the Board's discussion of the "aggravation concept" and its reliance on *Ovies v. Director*, BLR, BRB No. 80–344 BLA (June 11, 1981), *vacated and remanded*, 681 F.2d 815 (4th Cir. 1982), as gratuitous. Because *Ovies* served as an alternative ground which need not be considered, we think it prudent to leave this important constitutional problem for another day.

### IV

For the reasons expressed in this opinion, the Board's order is

AFFIRMED.

Underhill suffered from a disease caused or aggravated by dust. Thus, the distinction between "medical" and "legal" pneumoconiosis is irrelevant in light of the record.