**PEABODY COAL COMPANY, et al., Petitioners,**

v.

**Howard T. LOWIS and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

No. 82–1983.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1983.

Decided May 17, 1983.

---

Mark E. Solomons, Washington, D.C., for petitioners.

Denise Butler Harty, Washington, D.C., for respondents.

Before CUMMINGS, Chief Judge, POSNER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The Peabody Coal Company and its insurer the Old Republic Insurance Company petition for review of a decision of the Benefits Review Board of the United States Department of Labor, awarding benefits for "black lung" disease to Howard Lowis under the Federal Mine Safety and Health Act, 30 U.S.C. sections 901–945 (1978). We reverse.

## I.

Congress first enacted the Federal Coal Mine Health and Safety Act of 1969, and later passed amendments contained in the Federal Mine Safety and Health Amendments of 1977[1] in an effort to improve working conditions and safety in the nation's mines. Congress established a compensation program to provide benefits to disabled miners and survivors of deceased miners if the miner was disabled or killed by coal workers' pneumoconiosis, an occupational disease commonly known as "black lung,"[2] in addition to imposing safety and health regulations on the coal industry with this legislation.

The Act defines pneumoconiosis as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments arising out of coal mine employment." 30 U.S.C. § 902(b) (amended 1977). The Act provides that the coal mine operator or its insurance carrier is financially responsible for all claims filed after December 31, 1973 unless an approved state workers' compensation program exists in the state in which the coal mine is located.[3] 30 U.S.C. § 932(a), (b) (no state to date has adopted such a program).

In addition to the statutes previously discussed, Congress authorized the Depart-

---

**1.** 30 U.S.C. § 801 et seq. as amended by 30 U.S.C. §§ 901–945 (1976, Supp. I 1977 and Supp. II 1978).

**2.** See also this court's discussion in Underhill v. Peabody Coal Co., 687 F.2d 217 (7th Cir.1982).

**3.** The federal government was financially responsible for claims filed prior to December 31, 1973. For claims filed after December 31, 1973, the federal government is liable only to the extent that no financially responsible coal mine operator or insurer can be found.

ment of Labor to promulgate regulations to implement the protection afforded under the Act, including an expanded definition of pneumoconiosis:

"For the purposes of the act, 'pneumoconiosis' means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosisanthro-silicosis, massive pulmonary fibrosis, progressive massive fibrosis silicosis, or silicotuberculosis arising out of coal mine employment. For purposes of this definition, a disease 'arising out of coal mine employment' includes any chronic pulmonary disease resulting in respiratory or pulmonary impairment significantly related to, or aggravated by, dust exposure in coal mine employment."

20 C.F.R. § 727.202.[4] The Labor Department regulations also established a so-called "interim presumption," setting forth certain medical criteria which, if proven by a claimant, establish a rebuttable presumption of pneumoconiosis arising out of coal mine employment. The "interim presumption" set forth in 20 C.F.R. § 727.203, provides that a miner who engaged in coal mine employment for at least ten years is presumed (subject to rebuttal) to be totally disabled by or to have died from work-related pneumoconiosis if one of the following elements is proven: (1) a chest roentgenogram (X-ray), biopsy or autopsy establishes the existence of pneumoconiosis; (2) ventilatory studies establish the presence of sufficiently severe chronic respiratory or pulmonary disease; (3) blood gas studies demonstrate the existence of a sufficient impairment in the transfer of oxygen from the lung alveoli to the blood; (4) other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment; or (5) in instances where no medical evidence is available, the affidavit of a deceased miner's survivor or other persons with knowledge of the miner's physical condition demonstrate the presence of a totally disabling respiratory or pulmonary impairment. *Underhill v. Peabody Coal Co.,* 687 F.2d 217, 220 (7th Cir.1982), 20 C.F.R. § 727.203(a)(1)–(a)(5).

The same Labor Department regulations further provide that the "interim presumption" described above may be rebutted in the following manner:

"(b) Rebuttal of interim presumption. In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if: (1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 420.412(a)(1) of this title); or (2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work (see § 420.412(a)(1) of this title); or (3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or (4) The evidence establishes that the miner does not, or did not, have pneumoconiosis."

20 C.F.R. § 727.203(b).

II.

Howard Lowis, a former employee of Peabody Coal Company (Peabody Coal),

---

**4.** Thus, the "legal" definition of pneumoconiosis contained in the above-quoted regulation includes not only "true or clinical" pneumoconiosis but also other respiratory or pulmonary diseases arising from dust exposure in coal mine employment. *See Bishop v. Peabody Coal Co.,* 690 F.2d 131, 135 (7th Cir.1982); *Ansel v. Weinberger,* 529 F.2d 304, 310 (6th Cir.1976). This expanded legal definition of pneumoconiosis is based on a recognition that prolonged exposure to coal dust may cause respiratory and pulmonary impairments other than clinical pneumoconiosis and Congress' decision that the Act should provide relief for those disabled by illnesses caused by exposure to coal dust other than clinical pneumoconiosis. *See* S.Rep. No. 743, 92nd Cong., 2d Sess., reprinted in 1972 Code Cong. & Ad.News 2305, 2314–15.

filed a claim for "black lung" benefits on October 23, 1978. The United States Department of Labor, Workers' Compensation Programs Office, approved Lowis's claim and determined that Peabody Coal was responsible for payment of the benefits. Peabody Coal and Old Republic Insurance Company, Peabody Coal's insurer, denied liability and requested a hearing. Lowis was awarded benefits by an Administrative Law Judge after a hearing on April 15, 1980 and the Benefits Review Board affirmed the ALJ's liability determination.

Lowis was employed by the petitioner Peabody Coal Company at its coal mine in Pawnee, Illinois from December of 1966 through October of 1978. At the hearing before the Administrative Law Judge, Lowis described his coal mine employment as follows:

"Q. During the twelve years that you worked for Peabody, would you tell me the different types of jobs that you had, different types of job classification?

A. Well, I was about three years a laborer, and I scooped on the belt. I run a ramp car, a buggy, and just odd jobs around in the runs.

Q. What else did you do? .

A. Then after that I roof bolted for about a year, and the rest of the time, I put in as a repairman here.

Q. Now, the twelve years that you had with Peabody then at Mine # 10, would all of the jobs that you have just described to us been working underground?

A. Yes.

*     *     *     *     *     *

Q. Now, during the time that you worked for Peabody, this twelve years, and you have told us about the various types of jobs, would you describe the types of conditions that you worked in?

A. Conditions I worked in, well, when I first started, we rocked just by hand, throwed the ribs, and you would have to throw rock dust on the ribs, be wet in the mine.

Q. Keep your voice up a little if you can, Howard.

A. In the miner run, they used water on the miner, and the ribs would be wet, and we would have to throw that rock dust on the ribs and on the bottom. And we would have to throw, we scooped coal on a belt and then running the ramp car into the miner and a buggy, too, same way.

Q. What were the conditions like under there, as far as dust, dirt, etc., like that, when you were working?

A. Well, sometimes they would be more than one scooping on a belt, and a lot of times, when they would throw a shovel full of coal on the belt, it would be dust a-flying, and it was kind of dusty scooping on the belt part of the time.

Q. During the—you told us you worked about eight years as a repairman here, is that correct?

A. Yes.

Q. Would that job involve working at or near the face?

A. Yes.

Q. How much, percentage wise, would you say of your work as a repairman here was spent near the face, where the miner was?

A. Well, I would say about 50% of it, because, usually that is where the machines would break down, would be at the face, and that is where we would have to go to work on one." [5]

5. Lapp, A Lawyer's Medical Guide to Black Lung Litigation, 83 W.Va.L.Rev. 721, 728 (1981) contains the following brief synopsis of the respective coal dust exposure of various job categories in coal mines:

"All men who work at a coal mine, whether underground or at the surface, are regarded as miners. The areas where the coal is cut is known as the coal face and it is the most dusty part of the mine. The men who operate the cutting machines and continuous miners and their helpers are thus exposed to the highest concentrations of coal mine dust. Shot firers and loading machine operators are only slightly less exposed since their work is also basically at the face. Roofbolters also work just behind the face and are thus similarly exposed, but they also may be exposed to silica from the rock strata above the coal seam. Shuttle car operators who

Lowis further testified that toward the end of his career at the mine, he suffered from shortness of breath:

> "we have to walk in the runs where we worked on the machines and walking in, I couldn't make it, I would run out of air, I would have to stop and catch up with my breath."

Lowis retired from his employment with Peabody Coal at age 57 upon the advice of a physician because of respiratory problems and has been unemployed since retiring due to his respiratory problems. At the hearing Lowis stated that subsequent to his retirement he has continued to experience respiratory problems. Finally, Lowis testified, on both direct and cross-examination, that he had smoked an average of a pack of cigarettes per day for at least 30 years prior to retiring from Peabody Coal, and has continued this same daily smoking pattern since retiring.

Lowis also introduced the reports of three physicians in support of his claim for black lung benefits. Dr. James Foster,[6] after examining a chest X-ray of January 1, 1979,[7] found no evidence of pneumoconiosis, stating that the X-ray showed a small scar or tumor on Lowis's right lung and suggested that Lowis might be suffering from emphysema.[8] The X-ray film was also examined by Dr. Harold Spitz, a certified "B" reader,[9] who also found no signs of pneumoconiosis.

Dr. William Drake, director of the Pulmonary Function Laboratory at St. Francis Hospital in Litchfield, Illinois,[10] on behalf of the Department of Labor, also examined the X-ray film of Lowis's lungs and concluded that it failed to demonstrate that Lowis was suffering from pneumoconiosis but rather, Lowis's condition more closely resembled emphysema. In addition to examining his chest X-ray, Dr. Drake performed a ventilatory study on Lowis. A ventilatory study determines a person's ability to move air in and out of their lungs, by measuring two separate criteria: (1) the forced expiratory volume (FEV), which is the maximum amount of air measured in liters that a particular individual can expel from his or her lungs in one second; and (2) the maximum voluntary ventilation (MVV), which is the total volume of air, in liters, that an individual expels over a period of one minute during maximum repetitive respiratory effort. See, Lapp, A Lawyer's Medical Guide to Black Lung Litigation, 83 W.Va.L.Rev. 721 (1981). The ventilatory test performed by Dr. Drake disclosed that Lowis had an FEV of 1.19 (as compared with an estimated normal FEV of 3.07 for a person of Lowis's age, weight and height) and an MVV of 51.0 (compared with an estimated normal MVV of 136.4 for a person of Lowis's age, weight and height). The results of the ventilatory test performed by Dr. Drake were sufficient to

---

convey the coal from the loading machine to the underground railway and the motorman and brakeman who operate the railway are exposed to smaller amounts of dust than face workers. The motorman and brakeman may, however, be additionally exposed to pulverized silica from sand that is placed on the tracks to obtain traction. Certain miners, whose base of operation is further back from the coal face, are intermittently exposed to coal dust. These include mechanics, electricians, and general laborers, whose tasks are to maintain the utilities, conveyor belts, tracks and the cage, and also to maintain the machinery and equipment."

6. The record does not disclose in what field of medicine Dr. Foster specializes.

7. The parties do not dispute that the X-ray satisfies the quality standards of 20 C.F.R. § 727.206(a).

8. There is no evidence in the record that emphysema is in any way related to coal dust exposure. Although the exact causes of emphysema are not known, there is no reliable medical evidence demonstrating a significant causal relationship between exposure to coal dust and emphysema. Lapp, A Lawyer's Medical Guide to Black Lung Litigation, 83 W.Va.L. Rev. 721, 749–50 (1981); Morgan and Lapp, Respiratory Disease in Coal Miners, 113 Am. Rev. of Respiratory Disease 531, 532 (1976).

9. A "B" reader is a physician who has received special training and passed a proficiency examination for reading X-rays for pneumoconiosis.

10. The record also fails to disclose Dr. Drake's area of medical specialization.

raise a presumption of pneumoconiosis arising from coal mine employment under 20 C.F.R. § 727.203(a)(2).[11]

Dr. Thomas A. Dew, Director of Pulmonary Medicine at St. Lukes Hospital in St. Louis, Missouri, and a board certified specialist in the field of internal medicine and pulmonary diseases, conducted an extensive physical examination of Lowis on behalf of Peabody Coal. Dr. Dew's examination of Lowis, the most thorough performed in connection with Lowis's claim for benefits, consisted of testing his blood pressure, pulse, respiration, examining Lowis's ears, nose and throat, conducting a stethoscopic examination of his chest, reviewing the results of blood count and urinalysis tests, examining Lowis's chest X-ray and performing a ventilatory study and a blood gas study.

The ventilatory study conducted by Dr. Dew disclosed an FEV of 1.90 and an MVV of 57.0, qualifying under the Labor Department regulations to trigger the presumption of employment-caused pneumoconiosis contained in 20 C.F.R. § 727.203(a)(2). Dr. Dew also performed a blood gas study,

which measures the lung's ability to transport oxygen from the lung's alveoli[12] into the blood. In a blood gas study, an arterial blood sample is tested for oxygen pressure ($PO_2$) and carbon dioxide pressure ($PCO_2$) measured in millimeters of mercury (mm Hg). A reading lower than the normal $PO_2$ of 97mm Hg and/or higher than the normal $PCO_2$ of 40mm Hg indicates an impaired ability to absorb oxygen into and/or expel carbon dioxide from the blood. *See,* Shapiro, Clinical Application of Blood Gases 20–23 (1973) *and* Smith and Newman, The Basics of Federal Black Lung Litigation, 83 W.Va.L.Rev. 763, 785 (1981). Dr. Dew's blood gas study of Lowis resulted in a $PO_2$ (oxygen pressure) reading of 66 and a $PCO_2$ (carbon dioxide pressure) reading of 43. In contrast to the results of the ventilatory studies conducted by Drs. Dew and Drake, the results of the blood gas study conducted by Dr. Dew were insufficient to raise the presumption of pneumoconiosis caused by coal mine employment contained in 20 C.F.R. § 727.203(a)(3).[13]

11.  20 C.F.R. § 727.203(a)(2) states:
"Section 727.203 Interim presumption.
(a) Establishing interim presumption. A miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of death, or death will be presumed to be due to pneumoconiosis, arising out of that employment, if one of the following medical requirements is met:

\*     \*     \*     \*     \*     \*

(2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in § 410.412(a)(2) of this title) as demonstrated by values which are equal to or less than the values specified in the following table:

|  | Equal to or less than— | |
| --- | --- | --- |
|  | FEV | MVV |
| 67″ or less | 2.3 | 92 |
| 68″ | 2.4 | 96 |
| 69″ | 2.4 | 96 |
| 70″ | 2.5 | 100 |
| 71″ | 2.6 | 104 |
| 72″ | 2.6 | 104 |
| 73″ or more | 2.7 | 108″ |

12.  The alveoli are defined as follows:

"The air cells of a lung; the tiny sacs or chambers which are the outpouchings from the finest bronchial tubes. The gaseous exchange between the blood of the lung and the air of the lung takes place through the wall of each such cell. By gaseous exchange is meant the passage of oxygen from the air within the lung into the blood, and the passage of carbon dioxide from the blood into the air of the lung. Also called 'pulmonary alveoli.'"
Schmidt, Attorneys' Dictionary of Medicine 138 (1982).

13.  20 C.F.R. § 727.203(a)(3) recites:
"Section 727.203 Interim presumption.
(a) Establishing interim presumption. A miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of death, or death will be presumed to be due to pneumoconiosis, arising out of that employment, if one of the following medical requirements is met:

\*     \*     \*     \*     \*     \*

(3) Blood gas studies which demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood as indicated by values which are *equal to or less* than the values specified in the following table:

Although the results of the blood gas study conducted by Dr. Dew were insufficient to trigger a presumption of employment-caused pneumoconiosis, the ALJ ruled that Lowis had established a presumption of employment-caused pneumoconiosis based on the results of the two ventilatory studies performed by Drs. Dew and Drake, coupled with Lowis's more than ten years of coal mine employment, under 20 C.F.R. § 727.203(a)(2).[14] The ALJ then turned to the evidence offered by Peabody Coal and Old Republic to rebut the interim presumption. In rebuttal, Peabody Coal and Old Republic introduced the deposition testimony of Dr. Dew, which recites in relevant part:

"A. My conclusion about Mr. Howard Lowis was that he has moderately severe obstructive lung disease. His chest X-ray is interpreted as normal. Chest X-rays are poor interpretors of severe obstructive lung disease. He had no evidence of pneumoconiosis on his chest X-ray. I feel that he was totally disabled from mining on the basis of his severe obstructive lung disease. I could find no evidence that his severe obstructive lung disease was related to his coal mining with only a short exposure of 12 years, no dirty jobs during that 12 years, and the fact that his chest X-ray was completely normal.

Q. Now the job that he had, for the first two years, according to his statement taken, he was a laborer underground; and then the next two years he was a roof bolter which would require. him to come behind the mining machine and bolt up the roof; and then for the last eight years he was a mechanic, which is repairing of the equipment and it is down below with torches and welding and, of course, other repairs and welding. How is that in any way significant with that kind of history so far as your opinion and diagnosis is concerned?

A. His job as a roof bolter was probably the most exposure of among the jobs he had. He had two years in that job. His exposure is not large compared to most people who work in the mine. It was my feeling after examining Mr. Lowis that he had moderately severe obstructive lung disease on the basis of his cigarette inhalation, which was well supported by the changes in his pulmonary functions. His pulmonary functions were quite severe, deranged enough to leave him to be totally disabled. Yet at the same time his chest X-rays showed absolutely no evidence of even simple coal workers pneumoconiosis, so I think his symptoms are related to his cigarette abuse and not related to his occupation.

Q. Is there some way scientifically you can support that?

A. The best way scientifically is by definition. Coal workers' pneumoconiosis is defined by all the text books as occupational lung disease, Morton Seaton and other lung text books, in itself implies an abnormal chest X-ray. Simple coal workers' pneumoconiosis is known to have normally well preserved pulmonary functions and abnormal chest X-rays. So that the chest X-ray comes first from the dust inhalations well before one becomes beginning changes on a person's pulmonary

| Arterial pO2 | Arterial pCO2 equal to or less than (mm Hg.) |
| --- | --- |
| 30 or below | 70 |
| 31 | 69 |
| 32 | 68 |
| 33 | 67 |
| 34 | 66 |
| 35 | 65 |
| 36 | 64 |
| 37 | 63 |
| 38 | 62 |
| 39 or below | 61 |
| 40-45 | 60 |
| Above 45 | Any Value" |

**14.** In initially determining whether the presumption of employment caused pneumoconiosis under § 727.203(a)(2) has been established, only the duration of coal mine employment and

function. Consequently, the man has severe pulmonary disarrangement by pulmonary functions but a normal chest X-ray. There is no way one can make the diagnosis this is related to simple coal workers' pneumoconiosis. *It has to be related to his cigarette smoking. The changes we see in his lung functions and on chest X-ray would not be unusual for someone who smoked this amount of cigarettes in his lifetime.*" (emphasis added).

No other evidence was introduced in an attempt to rebut the interim presumption and *no evidence was offered to challenge or contradict Dr. Dew's conclusion that Lowis's disability was caused by his smoking rather than his coal mine employment.* The ALJ found that Dr. Dew's deposition testimony failed to rebut the interim presumption which arose because of the ventilatory study results:

"Upon evaluation of his rebuttal evidence, I have concluded that it does not form a basis for refuting the inference that the claimant's total disability resulted from his exposure to coal mine dust because Doctor Dew could not state with a reasonable degree of medical certainty that claimant's respiratory impairment was caused by his cigarette smoking and because his conclusion appears to be based exclusively on chest X-rays."

Having concluded that the interim presumption had not been rebutted, the ALJ found Peabody Coal liable for Lowis's compensation claims. The Benefits Review Board affirmed the ALJ's decision.

In this appeal, Peabody Coal and Old Republic Insurance concede that the interim presumption was properly invoked and that Lowis's respiratory condition renders him totally disabled. However, the appellants contend that Lowis's respiratory condition arose from his cigarette smoking, not from his coal mine employment, and that the ALJ erred in finding that the interim presumption of pneumoconiosis caused by coal mine employment had not been rebutted.

The ALJ's finding that Peabody Coal failed to rebut the interim presumption was based on a determination that (1) "Doctor Dew could not state with a reasonable degree of medical certainty" that Lowis's disability was caused by cigarette smoking rather than coal mine employment; and (2) Dr. Dew's conclusion "appears to be based exclusively on chest X-rays." The issue we consider is whether the ALJ's rejection of Peabody Coal's rebuttal evidence was supported by substantial evidence and in accordance with law. *Underhill v. Peabody Coal Co.*, 687 F.2d 217, 222 (7th Cir.1982).

### A.

The ALJ relied on the Benefit Review Board's decision in *Blevins v. Peabody Coal Co.*, 9 BRBS 510, BRB No. 78–406 BLA (1978) to support his rejection of Dr. Dew's deposition testimony because it was not phrased in the magic terms of a "reasonable medical certainty." In *Blevins,* the Benefit Review Board stated that testimony of a physician offered to rebut an interim presumption of pneumoconiosis must be "phrased in terms of a 'reasonable medical certainty' . . ."

This court rejected the "reasonable medical certainty" standard in the recent case of *Underhill v. Peabody Coal Co.*, 687 F.2d 217 (7th Cir.1982). In *Underhill,* a former coal miner claiming black lung benefits triggered the presumption of employment-caused pneumoconiosis through introducing ventilatory function test results. To rebut the interim presumption, the coal mine operator in *Underhill* introduced the medical opinions of three physicians stating that the claimant's lung problems were not caused by coal mine employment, but rather by chronic bronchitis and emphysema, which the physicians believed were due to excessive and long-term smoking. The ALJ rejected this rebuttal evidence because, according to the ALJ, the medical opinions were "unsubstantiated" and not phrased in

---

the ventilatory test results are considered. Other evidence, including a history of cigarette smoking, comes into play only in determining whether the presumption has been rebutted.

terms of a "reasonable degree of medical certainty." This court disagreed, and held that the ALJ's reliance on the "reasonable degree of medical certainty" standard was improper:

> "We also agree ... that the 'reasonable degree of medical certainty' standard advanced by the ALJ was improper. The purpose of this evidentiary test is to prevent speculation by the trier of fact, see *Kirschner v. Broadhead,* 671 F.2d 1034, 1039–40 (7th Cir.1982), but it applies with equal force to both plaintiffs' and defendants' experts. Under the DOL's [Department of Labor] regulations, however, claimants are permitted to invoke the pneumoconiosis presumption simply on the basis of 'the documented opinion of a physician simply exercising reasoned medical judgment.' 20 C.F.R. § 727.-203(a)(4). Although Congress authorized the DOL to liberalize claims criteria, the DOL cannot establish a standard that treats the same proof differently depending on which side offers it. Put differently, if a doctor's opinion based on mere 'reasoned medical judgment' is sufficiently probative for the purposes of claimants, it must be sufficiently probative for the purposes of mine operators and their insurers as well."

This court in *Underhill* went on to hold that a physician's opinion, expressed in clear and uncontradicted terms and based on a physical examination, a ventilatory study, chest X-rays and a review of the miner's employment history satisfies the "reasoned medical judgment" standard.

■ Dr. Dew's examination of Lowis was the most thorough performed on Lowis in connection with his pneumoconiosis claim and consisted of tests of Lowis's pulse, blood pressure, respiration, examination of ears, nose and throat, a stethoscopic examination of his chest, blood count and urinalysis tests, as well as an examination of the chest X-ray film and a ventilatory study and a blood gas study. It is clear that the ALJ erred in rejecting Dr. Dew's deposition testimony on the grounds that it was not phrased in terms of a "reasonable degree of medical certainty." Like the medical opinion held sufficient to rebut the interim presumption in *Underhill,* Dr. Dew's medical opinion based on a review of Lowis's employment history and the most thorough examination performed in connection with Lowis's claim for black lung benefits was clear and uncontradicted. Accordingly, the ALJ's decision, dismissing Dr. Dew's clear and uncontradicted testimony merely because Dr. Dew did not use the magic phrase "reasonable degree of medical certainty," is directly contrary to this court's *Underhill* holding.

### B.

■ The ALJ also supported his rejection of Dr. Dew's medical opinion by stating that Dr. Dew's "conclusion appears to be based exclusively on chest X-rays." Although negative X-ray results *alone* are not sufficient to rebut the presumption of employment-caused pneumoconiosis, *Underhill,* 687 F.2d at 223, *Ansel v. Weinberger,* 529 F.2d 304, 310 (6th Cir.1976), negative X-ray films are highly probative and must be given great weight in rebutting the presumption when corroborated by other medical evidence. *United States Steel Corp. v. Gray,* 588 F.2d 1022, 1028 (5th Cir.1979). *Cf. Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 32–33, 96 S.Ct. 2882, 2900, 49 L.Ed.2d 752 (1976), *Underhill,* 687 F.2d at 223. It is clear from Dr. Dew's deposition testimony that, while he did take in account the chest X-ray films, he in fact did *not* rely *solely* on the claimant's chest X-ray films in reaching his conclusion. Rather, in addition to the chest X-ray films, Dr. Dew based his medical opinion on (1) the duration of Lowis's coal mine employment; (2) the type of jobs performed by Lowis; (3) the results of the ventilatory study and blood gas study; (4) Lowis's history of cigarette smoking; as well as (5) Dr. Dew's thorough physical examination of Lowis. In his deposition, Dr. Dew stated:

> "A. My conclusion about Mr. Howard Lowis was that he has moderately severe obstructive lung disease. His chest X-ray is interpreted as normal. Chest X-rays are poor interpretors of severe obstruc-

tive lung disease. He had no evidence of pneumoconiosis on his chest X-ray. I feel that he was totally disabled from mining on the basis of his severe obstructive lung disease. *I could find no evidence that his severe obstructive lung disease was related to his coal mining with only a short exposure of 12 years, no dirty jobs during that 12 years, and the fact that his chest X-ray was completely normal.*

Q. Now the job that he had, for the first two years, according to his statement taken, he was a laborer underground; and then the next two years he was a roof bolter which would require him to come behind the mining machine and bolt up the roof; and then for the last eight years he was a mechanic, which is repairing of the equipment and it is down below with torches and welding and, of course, other repairs and welding. How is that in any way significant with that kind of history so far as your opinion and diagnosis is concerned?

A. His job as a roof bolter was probably the most exposure of among the jobs he had. He had two years in that job. His exposure is not large compared to most people who work in the mine. It was my feeling after examining Mr. Lowis that he had moderately severe obstructive lung disease on the basis of his cigarette inhalation, which was well supported by the changes in his pulmonary functions. His pulmonary functions were quite severe, deranged enough to leave him to be totally disabled. Yet at the same time his chest X-rays showed absolutely no evidence of even simple coal workers pneumoconiosis, so I think his symptoms are related to his cigarette abuse and not related to his occupation.

Q. Is there some way scientifically you can support that?

A. The best way scientifically is by definition. Coal workers' pneumoconiosis is defined by all the text books as occupational lung disease, Morton Seaton and other lung text books, in itself implies an abnormal chest X-ray. Simple coal workers' pneumoconiosis is known to have normally well preserved pulmonary functions and abnormal chest X-rays. So that the chest X-ray comes first from the dust inhalations well before one becomes beginning changes on a person's pulmonary function. Consequently, the man has severe pulmonary disarrangement by pulmonary functions but a normal chest X-ray. There is no way one can make the diagnosis this is related to simple coal workers' pneumoconiosis. *It has to be related to his cigarette smoking. The changes we see in his lung functions and on chest X-ray would not be unusual for someone who smoked this amount of cigarettes in his lifetime.*" (emphasis added).

■ Dr. Dew's deposition testimony demonstrated that his final conclusion and medical findings were based on a compilation of the results of *all* his medical tests, studies and evaluations, including but by no means limited to the chest X-ray films. The negative X-ray results were fully corroborated by Dr. Dew's medical opinion based on the subject's medical and work history, including the duration and types of jobs performed by Lowis in the mines, the results of the ventilatory study and the blood gas study, Lowis's history of cigarette smoking and Dr. Dew's thorough physical examination of Lowis. Nevertheless, the ALJ refused to consider the substance of Dr. Dew's testimony and focused solely on his references to the X-ray results. In ignoring the substance of Dr. Dew's testimony, the ALJ violated the mandate of 20 C.F.R. § 727.203(b) that "*all* relevant medical evidence shall be considered" in determining whether the presumption of employment-caused pneumoconiosis had been rebutted. The ALJ simply may not reach his desired result by disregarding the reasoned medical opinion of a board certified specialist in internal medicine and pulmonary diseases, which is based on extensive examination and medical testing of the claimant; "an ALJ is not free to substitute his own expertise for that of a qualified physician. . . ." *Underhill,* 687 F.2d at 222. As this court recently stated in the context of an ALJ's findings in an unfair labor practice hearing:

"Having carefully examined the record below, we conclude that the ALJ's findings are not supported by substantial evidence. Viewed in its entirety, the testimony of the witnesses does not contain the kind of 'important discrepancies' sufficient to support a finding discrediting direct, uncontroverted testimony. *White Glove Building Maintenance, Inc. v. Brennan,* 518 F.2d 1271, 1274 (9th Cir.1975). In several instances, the ALJ has read testimony out of context or has failed to take into account other evidence which conflicts with the conclusions drawn. This kind of selective analysis is prohibited under the standard set forth in *Universal Camera.* Moreover, it is particularly inappropriate in a case where the inferences drawn are contrary to direct, positive testimony. In order to support such inferences, the evidence must be internally contradictory or inherently improbable."

*NLRB v. Cutting, Inc.,* 701 F.2d 659, 665 (7th Cir.1983). Likewise, the ALJ in this case performed a selective analysis of the rebuttal testimony, taking out of context Dr. Dew's references to the X-ray films in order to reach the desired result. In summary, we conclude that there was no valid legal basis for the ALJ's refusal to consider Dr. Dew's direct, uncontradicted testimony.

### III.

■ The medical evidence introduced before the ALJ consistently demonstrated that Lowis did not suffer from pneumoconiosis caused by coal mine employment. Drs. Foster, Spitz, Drake and Dew all found no medical evidence that Lowis was suffering from employment-caused pneumoconiosis and Drs. Foster and Drake both concluded that Lowis was more likely suffering from emphysema, rather than employment-caused pneumoconiosis. Dr. Dew stated in unequivocal terms that, based on a thorough physical examination, Lowis's chest X-rays, Lowis's ventilatory test results, blood gas study results, his history of cigarette smoking and his employment history, Lowis's respiratory impairment was, in his medical opinion, clearly and unequivocally

due to Lowis's cigarette smoking and not his coal-mine employment. Absent the support in the record of medical evidence to the contrary, we hold that the ALJ could not rationally conclude that Dr. Dew's deposition testimony failed to rebut the interim presumption established by the ventilatory studies. In summary, we hold that the ALJ's decision and the Benefit Review Board's affirmance thereof were not supported by substantial evidence in the record. Accordingly, the Board's order is RE-VERSED.