816 F.2d 683
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Betty WHEELER, Widow of Ulysses Wheeler, Petitioner,
v.
CONSOLIDATION COAL COMPANY; et al., Respondents.
 No. 86-3435.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1987.
 
 Before MARTIN and Nelson, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Petitioner Betty Wheeler seeks review of the decision of the Benefits Review Board which upheld an administrative law judge's decision denying Wheeler's claim for black lung benefits. The petitioner is the widow of a deceased coal miner, Ulysses Wheeler. The petitioner claims error in the ALJ's treatment of the opinion of her husband's treating physician, Dr. E. Freeman, and in the ALJ's reliance on nonqualifying blood gas studies in finding that the presumption of pneumoconiosis was rebutted.
 
 I.
 
 2
 Ulysses Wheeler filed a claim for black lung benefits on July 27, 1973. Although he was initially determined to be eligible for benefits, his employer, the Consolidation Coal Company, timely disputed its liability for benefits. Mr. Wheeler subsequently died on June 3, 1981, after which his widow, Betty Wheeler, filed her widow's claim for benefits. A hearing on this claim was held before an ALJ on April 19, 1983, where the following background and medical evidence was introduced.
 
 
 3
 Ulysses Wheeler was born on May 30, 1922, attended school through the fifth grade, and married Betty Williams on August 2, 1947. When Mr. Wheeler initially filed his claim for benefits, he was working in a coal mine as a greaser, shotfirer and conveyorman helper for the Consolidation Coal Company. He last worked in a coal mine on October 19, 1980, resulting in a total of fifteen and one-half years of coal mine employment.
 
 
 4
 The first medical evidence of record is dated August 8, 1973, when Mr. Wheeler was admitted to St. John's Medical Center. Dr. George M. Eicher performed a ventilatory test at that time which resulted in nonqualifying values under the interim tables. See 20 C.F.R. Sec.727.203(a) (2). Dr. Eicher believed there was evidence of obstructive pulmonary disease. An x-ray also taken on August 8, 1973, was read by Dr. J. J. Yobbagy as revealing cardiomegaly and hilar congestion, but no evidence of pneumoconiosis. Dr. Richard Elmer reread this x-ray on December 9, 1979 as being completely negative for pneumoconiosis.
 
 
 5
 On November 29, 1974, Wheeler was seen on an outpatient basis at Martins Ferry Hospital by Dr. J. J. DelVecchio, who diagnosed arteriosclerotic heart disease and probable hypertension.
 
 
 6
 On June 6, 1979, Wheeler was admitted to Harrison Hospital and was seen by Dr. E. Freeman, his examining physician. Dr. Freeman noted that Wheeler suffered from hypertensive heart disease and also stated that a chest x-ray revealed cardiomegaly. Although Wheeler responded well to medication and was sent home, he returned to the hospital on September 17, 1979, at which time Dr. Freeman diagnosed hypertensive heart disease, emphysema and obesity. A chest x-ray again revealed mild cardiomegaly but no active pulmonary or plural disease.
 
 
 7
 On October 26, 1979, Wheeler underwent testing at the request of the Department of Labor. Blood gas tests yielded nonqualifying values, and a chest x-ray was interpreted by Dr. S. Shaw as completely negative for pneumoconiosis. That same x-ray was later reread by Dr. Reginald Greene, a certified B reader,[1] as being unreadable due to poor quality.
 
 
 8
 Wheeler was readmitted to Harrison Hospital on April 1, 1980, and was again treated by Dr. Freeman. At that time, Dr. Freeman diagnosed arteriosclerotic heart disease, chronic obstructive lung disease and emphysema of the lungs. Dr. S. Shaw read a chest x-ray taken at that time as indicating moderate cardiomegaly, but there was no diagnosis of pneumoconiosis.
 
 
 9
 Wheeler was seen by Dr. C. Vaughn Strimlan on August 12, 1980, at the request of his employer. Dr. Strimlan performed ventilatory tests which resulted in non-qualifying values under the interim presumptions. He also performed blood gas studies which also indicated nonqualifying values. A chest x-ray showed cardiomegaly but no evidence of pneumoconiosis. Based on his examination, Dr. Strimlan diagnosed hypertensive cardiovascular disease, arteriosclerotic heart disease, obesity and, importantly, restrictive ventilatory impairment secondary to Wheeler's hypertension, artersclerosis and obesity. Dr. Strimlan concluded that there was no evidence of pneumoconiosis since he attributed Wheeler's ventilatory impairment to his heart disease and obesity. The x-ray taken by Dr. Strimlan was subsequently reread as being negative for pneumoconiosis.
 
 
 10
 On August 25, 1980, Wheeler was examined by Dr. M. Megia at the Martins Ferry Hospital. Dr. Megia performed blood gas studies which yielded qualifying values under the interim presumption. See 20 C.F.R. Sec.727.203(a) (3). A chest x-ray taken at that time was read by Dr. Zoltan Szalontay as being positive for pneumoconiosis. This is the only positive reading of an x-ray found in the record. The x-ray was later reread by a certified B reader as negative for pneumoconiosis. Based .on the examination of Wheeler and the x-ray interpretation by Dr. Szalontay, Dr. Megia concluded that Wheeler suffered from pneumoconiosis as well as arteriosclerotic heart disease and obesity.
 
 
 11
 In January of 1981, Wheeler was hospitalized at the Veteran's Administration Medical Center in Cleveland, Ohio. Blood gas studies performed upon Wheeler's admission revealed qualifying values under the interim presumption. However, after Wheeler underwent treatment for his heart condition, blood gas studies were again performed which yielded nonqualifying values. Wheeler's diagnoses were congestive heart failure, cardiomegaly, hypertension and arteriosclerotic heart disease. There was no diagnosis of pneumoconiosis.
 
 
 12
 All medical evidence of record was reviewed by Dr. George Kress on March 16, 1981. In light of the medical evidence, Dr. Kress concluded that although the ventilatory and blood gas studies indicated that Wheeler suffered from a mild restrictive impairment and a mild resting hypoxemia, both of those diagnoses were "readily explainable on the basis of his obesity and his obviously severe hypertensive arteriosclerotic cardiovascular disease." It was Dr. Kress' opinion that no objective medical evidence indicated that pneumoconiosis had caused any impairment.
 
 
 13
 Wheeler died on June 3, 1981. There was no autopsy performed, but a death certificate prepared by Dr. Charles Evans indicated tbat Wheeler's death was due to cardiac arrest and arteriosclerotic heart disease. Also noted as a significant condition was pulmonary emphysema. There was no mention of pneumoconiosis.
 
 
 14
 Wheeler's complete medical record was subsequently reviewed by Dr. George Zaldivar on March 28, 1983. Dr. Zaldivar essentially reached the same conclusions previously made by Dr. Kress, stating that there was no evidence of record that Wheeler had any occupational pneumoconiosis. Dr. Zaldivar believed that the abnormalities of the blood gases were entirely due to Wheeler's well-documented heart disease.
 
 
 15
 Finally, Wheeler's treating physician, Dr. Freeman, completed a questionnaire form on March 28, 1983, in which he concluded that Wheeler suffered from a respiratory condition arising from, and precluding any further, coal mine employment. Dr. Freeman did not set forth any basis or rationale for his conclusion.
 
 
 16
 The ALJ rendered his decision on October 31, 1983. He first found that Wheeler was entitled to the benefit of the interim presumption set forth in 20 C.F.R. Sec.727.203(a) that he was totally disabled due to pneumoconiosis. He further found, however, that the weight of the medical evidence of record rebutted the presumption, pursuant to the provisions of Sec. 727.203 (b) (3) and (4) . Therefore, the ALJ found that Wheeler was not totally disabled due to pneumoconiosis at the time of his death.
 
 
 17
 The only remaining question for the ALJ was whether Wheeler's death was due to pneumoconiosis; if it was, then Wheeler's widow would be entitled to benefits in her own right. The ALJ found that under 20 C.F.R. Sec.718.205(b) Wheeler's death was not due to pneumoconiosis. Accordingly, the ALJ denied the claim for death benefits.
 
 
 18
 Betty Wheeler timely appealed the ALJ's decision to the Benefits Review Board. The Board rendered its decision on March 7, 1986, upholding the denial of benefits. Mrs. Wheeler requested reconsideration of the Board's initial decision, but the Board denied her request on April 17, 1986. Mrs. Wheeler then filed this timely petition for review pursuant to Sec.21 (c) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. Sec.921(c), as incorporated by Sec. 422(a) of the Black Lung Benefits Act, 30 U.S.C. Sec.932(a).
 
 II.
 
 19
 Our scope of review in petitions from decisions of the Benefits Review Board is narrow, and is related to the Board's own limited scope of review of decisions by an ALJ. The Board's review is limited to determining whether the ALJ's findings of fact and conclusions of law are supported by substantial evidence and are in accordance with law. If they are, then the Board may not set them aside. See 20 C.F.R. Sec.802.301. This court's review is limited to examining whether the Board adhered to its limited scope of review and made no errors of law. Gibas v. Saginaw Mining Co., 748 F.2d 1112, 1116 (6th Cir. 1984), cert. denied, 471 U.S. 1116 (1985). Thus, our focus is also on whether the ALJ's findings and rulings are supported by substantial evidence and the law--the same standard of review utilized by the Board. .See Ramey v. Kentland Elkhorn Coal Corp., 755 F.2d 485 (6th Cir. 1985) ; Sun Shipbuilding & Drydock Co. v. McCabe, 593 F.2d 234, 237 (3d Cir. 1979).
 
 
 20
 The parties acknowledge that the analysis in this case is governed by the interim presumption set forth in 20 C.F.R. Sec.727.203, since the disability claim is brought under Part C of the Black Lung Benefits Act, 30 U.S.C. Sec.931 et seq. Under 727.203(a), a claimant relying on medical evidence can establish a rebuttable presumption of pneumoconiosis by presenting evidence of one of the following: (1) a chest x-ray establishing the existence of pneumoconiosis; (2) ventilatory studies establishing a chronic respiratory or pulmonary disease as shown by test values which are equal to or less than certain regulatory standards; (3) blood gas studies which demonstrate an impairment in the transfer of oxygen from the lungs to the blood as shown by values equal to or less than certain regulatory standards; or (4) other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, which establishes the presence of a totally disabling respiratory or pulmonary impairment.
 
 
 21
 If the interim presumption is invoked, the opposing party is given an opportunity to rebut it. Section 727.203 (b) states that the presumption "shall be rebutted" if the evidence establishes: (1) that the miner is doing his usual coal mine work or comparable and gainful work; (2) that the individual is able to do his usual coal mine work or comparable and gainful work; (3) that the miner's total disability or death "did not arise in whole or in part out of coal mine employment;" or (4) that the miner does not have pneumoconiosis. According to the regulations, "all relevant medical evidence shall be considered" in determining whether these criteria are satisfied and the presumption is rebutted. The standard of proof required to establish one of the four enumerated rebuttal criteria is the same as that required to invoke the presumption--the standard of preponderance of evidence. See Underhill v. Peabody Coal Co., 687 F.2d 217, 223-24 (7th Cir. 1982); see also Steadman v. SEC, 450 U.S. 91, 95 (1981).
 
 
 22
 In the present case, the ALJ found that the interim presumption was invoked under Sec.727.203 (a) (1) and (a) (3) . The ALJ relied on Dr. Szalontay's positive reading of the x-ray taken on August 25, 1980, and on the values yielded by the blood gas studies taken upon Wheeler's admission to Veteran's Hospital in January, 1981. The employer concedes that the ALJ properly acted within his discretion in invoking the interim presumption. The ALJ further found that the presumption was rebutted pursuant to Sec.727.203 (b) (3) and (4). The ALJ relied primarily on the findings of Dr. Strimlan, who had examined Wheeler on August 12, 1980. According to Dr. Strimlan, Wheeler suffered from a pulmonary impairment, but did not suffer from pneumoconiosis; rather, Wheeler's heart condition was responsible for his pulmonary problems. Thus, in Dr. Strimlan's view, Wheeler not only did not suffer from pneumoconiosis, but his pulmonary disease did not arise from his coal mine employment. Consistent with these findings were the conclusions of Dr. Kress and Dr. Zaldivar. The ALJ acknowledged their reports as being corroborative of Dr. Strimlan's, but did not attribute as much weight to them since neither doctor had examined Wheeler personally. The ALJ found Dr. Strimlan's report to be more credible and more probative, however, than the questionnaire completed by Dr. Freeman, Wheeler's treating physician. The ALJ also explained why the medical evidence as a whole, including the multiple x-ray readings, ventilatory studies and the blood gas studies, rebutted the presumption.
 
 
 23
 The petitioner presents two arguments why the ALJ's decision that the interim presumption was rebutted is not supported by substantial evidence. Petitioner first argues that the ALJ's denial of her claim was based on the improper rejection of Dr. Freeman's report completed on March 28, 1983. She secondly claims that the ALJ committed reversible error when he relied on blood gas studies performed while Wheeler was receiving oxygen treatment to rebut the presumption of disabling pneumoconiosis.
 
 
 24
 The ALJ discredited Dr. Freeman's report in the following manner:
 
 
 25
 There are no carefully rationalized medical reports establishing the existence of pneumoconiosis or disability due to a respiratory condition.... Although the miner's treating physician, Dr. Freeman, answered affirmatively to formal questions as to whether the miner had a respiratory condition which arose out of his coal mine employment and whether he was totally disabled from such condition, there was absolutely no explanation or reason given by him for his single-word affirmative answers.
 
 
 26
 It is well-settled that an ALJ is not bound by one physician's. opinion. Peabody Coal Co. v. Director, Office of Workers' Compensation Programs, 581 F.2d 121, 124 (7th Cir. 1978). However, an ALJ can only disregard such an opinion when presented with countervailing evidence. Id. Since there is such countervailing evidence in this case, we find no error in the ALJ's rejection of Dr. Freeman's conclusory opinion.
 
 
 27
 Dr. Strimlan's report, corroborated by the subsequent reviews of Drs. Kress and Zaldivar, presented the ALJ with countervailing medical evidence. We find no error in the ALJ's decision to favor Dr. Strimlan's report over Dr. Freeman's, since Dr. Strimlan explained his analysis in a well-reasoned manner and Dr. Freeman merely answered "yes" in a questionnaire to the question of whether he thought that Wheeler suffered from disabling pulmonary disease caused by his coal mine work. Dr. Freeman had never before rendered such a diagnosis and he failed to substantiate it in this instance.
 
 
 28
 Having rejected the petitioner's first claim of error, we turn to the petitioner's argument based on Wheeler's blood gas studies. Blood gas studies taken upon Wheeler's admission to Veteran's Hospital in January of 1981 resulted in qualifying test values. These values were consistent with the results of blood gas studies performed in August of 1980 by Dr. Megia. Further blood gas studies performed at Veteran's Hospital, however, twice yielded nonqualifying values. Petitioner claims that these later studies were invalid, and therefore should not have been relied on by the ALJ as evidence supporting rebuttal of the presumption, since Wheeler had been undergoing oxygen treatment for his heart condition while at Veteran's Hospital.
 
 
 29
 We find no error in the ALJ's treatment of the blood gas studies. First, petitioner has not shown by medical evidence that her husband's medical treatment at Veteran's hospital skewed the later blood gas studies. Second, the ALJ did not rely solely on the allegedly "treatment tainted" studies but also relied on the multiple negative readings of x-rays which had been taken at various times. Every certified B reader found Wheeler's x-rays to be negative for pneumoconiosis. While negative x-ray interpretations are not sufficient standing alone to rebut the interim presumption, see Ansel v. Weinberger, 529 F.2d 304, 310 (6th Cir.1976), they assume probative value "when corroborated by other evidence such as expert medical testimony." Underhill v. Peabody Coal Co., 687 F.2d 217, 223 (7th Cir. 1982). Such corroborative testimony clearly existed in the detailed report of Dr. Strimlan and the reviewing reports of Drs. Kress and Zaldivar. Corroborative evidence also existed in the form of ventilatory studies and blood gas studies other than those performed at Veteran's Hospital which yielded nonqualifying results. In sum, we are unpersuaded that the ALJ improperly set his own expertise against that of a qualified medical expert. See Gober v. Matthews, 574 F.2d 772, 777 (3d Cir. 1978) . Rather, the ALJ correctly chose between properly submitted medical opinions, which he is permitted to do. Id. We hold that there is substantial evidence in the record from which the ALJ could find that the interim presumption was rebutted because Wheeler either did not suffer from pneumoconiosis or did not suffer from a disabling pulmonary disease which arose from his coal mine employment. 20 C.F.R. Sec.727.203(b) (3), (4).
 
 
 30
 Accordingly, we AFFIRM the decision of the Benefits Review Board.
 
 
 
 [1]
 B readers are certified by the Public Health Service. They have greater qualifications than certified A readers. See Couch v. Secretary of HHS, 774 F.2d 163, 164 n.1 (6th Cir. 1985)