**DRUMMOND COAL COMPANY, Petitioner,**

v.

**Frank P. FREEMAN and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

No. 83-7393.

United States Court of Appeals, Eleventh Circuit.

June 8, 1984.

**1524**

H. Thomas Wells, Jr., A. Inge Selden, III, Birmingham, Ala., for petitioner.

Roscoe C. Bryant, J. Michael O'Neill, Dept. of Labor, Washington, D.C., for respondents.

Hoyt Elliott, Jasper, Ala., for Freeman.

Before KRAVITCH and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Drummond Coal Company ("Drummond") petitions for review of the Benefits Review Board's (the "Board") decision awarding benefits under Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended,[1] 30 U.S.C. § 901 *et seq.*, to Frank P. Freeman,[2] a former employee of the company. We hold that the Administrative Law Judge (the "ALJ") applied an improper legal standard to the evidence, and therefore we vacate the Board's decision and order and remand the case for proceedings not inconsistent with this opinion.

Freeman was employed from July 1940 until June 1974 by the Marigold Coal Company, first as a coal truck driver for four years and then as a welder at a coal strip mine for thirty years. From July 1974 until June 31, 1977, Freeman worked as a welder for Drummond. All of Freeman's coal mine employment involved surface work at strip pit locations. Freeman retired in May 1977, at age sixty-five.

On June 21, 1977, Freeman filed a claim for benefits under the Act for alleged total disability due to pneumoconiosis. Pneumoconiosis, which is commonly known as "black lung," is a dust disease of the lungs arising from coal mine employment. The Department of Labor approved the claim, holding the coal mine operator, Drummond, liable. Drummond contested its potential liability and a formal hearing was held on August 6, 1980 before an ALJ, who awarded benefits to Freeman.

## I. MEETING THE PRESUMPTION

Freeman sought benefits on the basis of 20 C.F.R. § 727.203(a), which provides that a miner is presumed to be totally disabled due to pneumoconiosis if he or she has engaged in coal mine employment for at least ten years and one of four medical requirements is satisfied. The first medi-

---

1. Title IV of the Act has been amended three times since 1969: first by the Black Lung Benefits Act of 1972, Pub.L. No. 92–303, 86 Stat. 150; then by the Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, 92 Stat. 95; and most recently by the Black Lung Benefits Amendments of 1981, Pub.L. No. 97–119, 95 Stat. 1635. Prior to the 1972 amendments, a large number of claims were denied under the standards of the Social Security Administration ("SSA"). The 1972 amendments, which were implemented as interim presumptions at 20 C.F.R. § 410.490, were passed to liberalize eligibility requirements. The 1972 amendments also shifted responsibility for Part C claims (claims filed after December 31, 1973) to the Department of Labor ("DOL"). The DOL's claims approval rate, however, was significantly lower than that of the SSA because the SSA's liberal interim presumption was inapplicable to DOL cases. Congress responded with the Black Lung Benefits Reform Act of 1977, which was enacted to expand cover-

age and to liberalize claim awards. The Secretary of Labor was authorized to adopt new criteria which were to be no more restrictive than the SSA's interim presumption. The Secretary promulgated interim criteria at 20 C.F.R. § 727.200 *et seq.* including the presumption at issue in this case, at § 727.203. In addition, financial responsibility for Part C claims passed from the federal government, which pays Part B claims, to the employer or its insurance carrier, unless an appointed state workers' compensation program exists. *See Underhill v. Peabody Coal Co.,* 687 F.2d 217, 219–20 (7th Cir.1982), for a discussion of the Act's history. *See generally,* Solomons, A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of its Unresolved Issues, 83 W.Va.L.Rev. 869 (1981).

2. The Director of the Office of Workers' Compensation Programs (the "Director") is also a respondent in this case on appeal.

cal requirement is described in subsection (a)(1), which states that the miner can meet the presumption with a chest x-ray establishing the existence of pneumoconiosis. 20 C.F.R. § 727.203(a)(1). Before the ALJ, five x-ray films which had been read approximately ten times were submitted in evidence. The earliest x-ray was dated May 22, 1974 and was read by Dr. Terrell Bird, a radiologist, as indicating simple pneumoconiosis (category 1/0).[3] Dr. Juan Gonzalez, a radiologist, read an x-ray dated October 24, 1977 as consistent with pneumoconiosis (category 1/0). This film was later reread by Dr. George Risman and Dr. William S. Cole, both of whom are "B" readers,[4] as negative for pneumoconiosis. An x-ray dated April 17, 1979 was read by Dr. Lowell Clemmons as positive for pneumoconiosis. This film was reread by Dr. Cole, who found the film to be unreadable due to poor quality. Next, Dr. Ben V. Branscomb, who is also a "B" reader, read a film dated June 26, 1979 as negative for pneumoconiosis. Finally, a film was taken on March 14, 1980 and classed by Dr. Arthur Calix (who apparently is not classified as a reader) as compatible with pneumoconiosis (categories 2/1 and 1/1). This film was reread twice by two "B" readers, Dr. Thomas J. Payne III and Dr. Risman, as

negative for pneumoconiosis. The ALJ found that the requirements of subsection (a)(1) had been met because of the four x-ray readings that were positive for pneumoconiosis: those of Drs. Bird, Gonzalez, Clemmons, and Calix.

Under subsection (a)(2), the miner meets the presumption by introducing ventilatory studies that establish the presence of a chronic respiratory or pulmonary disease.[5] 20 C.F.R. § 727.203(a)(2). Six pulmonary function tests were put into evidence, but the ALJ credited only the study of Dr. Gilbert Hamilton as "substantially valid in form." The test demonstrated a one second forced expiratory volume ($FEV_1$) of 2.33 liters per second and a maximal voluntary ventilation (MVV)[6] of 81.88 liters per minute. Under section 727.203(a)(2), the presence of a chronic respiratory or pulmonary disease is established if an individual of Freeman's height (70") has an $FEV_1$ equal to or less than 2.5 and an MVV equal to or less than 100. The ALJ concluded that "[t]he five remaining ventilatory studies, while formally flawed or inadequate do at the minimum point to an undeniable pulmonary dysfunction in Claimant Freeman, as the reported $FEV_1$'s and MVV's are *far* below normal" (emphasis in original).

---

**3.** Pneumoconiosis is customarily classified as "simple" or "complicated." Simple is caused by dust alone and is identified by small opacities in the lung fields visible on a chest x-ray. Complicated, which is generally more serious, involves progressive massive fibrosis as a complex reaction to dust and other factors. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 7, 96 S.Ct. 2882, 2888, 49 L.Ed.2d 752 (1976).

Simple pneumoconiosis is classified into categories 1, 2, and 3 according to the profusion of small rounded opacities in the lung fields visible on x-ray, with category 1 indicating the least profuse and category 3 indicating very profuse. When the number of small opacities is insufficient for a diagnosis of category 1, the x-ray is classified as category 0. These four categories (0, 1, 2, and 3) are further subdivided into three subcategories, so that the range of categories is from 0/– through 3/4. The numerator represents the category in which the film is placed; the denominator represents the category that the reader also considered. Lapp, A Lawyer's Medical Guide to Black Lung Litigation, 83 W.Va.L.Rev. 721, 729–30 (1981).

**4.** Physicians can be certified as "A" (first) or "B" (final) readers according to their proficiency in interpreting chest x-rays of coal miners for evidence of pneumoconiosis. "B" is the higher classification of proficiency.

**5.** "Ventilatory function refers to the capacity of the lungs to accept, and the integrity of the airways which conduct, oxygen into and the waste gas, carbon dioxide, out of the gas exchange units. This is sometimes referred to as the bellows function of the lungs." Lapp, A Lawyer's Medical Guide to Black Lung Litigation, 83 W.Va.L.Rev. 721, 737–38.

**6.** "The $FEV_1$ measures in liters the volume of air which can be forcibly expelled from the lungs after maximum effort over a period of one second." Solomons, A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of its Unresolved Issues, 83 W.Va.L.Rev. 869, 879 n. 33 (1981). "The MVV or MBC measures, in liters, the total volume of air expelled over a period of one minute during repetitive maximal respiratory effort." *Id.* at 879 n. 34.

Under subsection (a)(4), the medical requirement necessary to create the presumption is met if "other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment." 20 C.F.R. § 727.203(a)(4). A number of medical reports were submitted into evidence. In Dr. Calix's opinion, Freeman has pneumoconiosis and is disabled from performing his usual coal mine work. Dr. Clemmons concluded that Freeman has extensive pneumoconiosis and is totally and permanently disabled "from a pulmonary standpoint." Dr. Hamilton diagnosed pneumoconiosis in conjunction with bronchitis, and indicated that Freeman is disabled from performing rapid or frequent repetitious lifting of weight. Dr. Gonzalez likewise diagnosed simple pneumoconiosis. The ALJ noted that Dr. Ben V. Branscomb offered a contrary opinion as to the cause and state of Freeman's disability but concluded that the clear weight of evidence supported a finding of total pneumoconiosis disability pursuant to 20 C.F.R. § 727.203(a)(4). The ALJ also considered Freeman's testimony that he was compelled to cease his coal mine work because of his coughing and breathing problems.

## II. REBUTTING THE PRESUMPTION

Drummond claims that the ALJ applied an improper legal standard to the rebuttal evidence.[7] The regulations provide four ways for the operator to rebut the presumption of total disability. 20 C.F.R. § 727.203(b).[8] In determining if the presumption is rebutted, the factfinder must consider "all relevant medical evidence." 20 C.F.R. § 727.203(b). The ALJ found that the presumption had not been rebutted:

> Although Respondent/Employer herein attempted to elicit convincing evidence from Dr. Branscomb ... that Claimant's respiratory difficulties were due to cigarette smoking and not to pneumoconiosis, I do not feel that this particular medical documentation has sufficiently satisfied the requirements set forth in *Blevins v. Peabody Coal Co.,* 9 BRBS 510, BRB No. 78-406 BLA, (December, 1978), for proving cigarette smoking in isolation as the cause of disability, in that his reasoning is not based on the totality of evidence on Mr. Freeman's pulmonary condition.

Drummond contends that the ALJ erred in applying the requirement of *Blevins v. Peabody Coal Co.,* 9 BRBS 510 (1978) ("Blevins II") to Dr. Branscomb's report and deposition testimony[9] and therefore

---

7. Drummond also claims that the ALJ improperly construed the presumption of 20 C.F.R. § 727.203 as shifting the burden of proof, rather than the burden of production, to the employer. We hold that the burden of proof shifts to the employer, for the reasons set forth in *Alabama By-Products Corp. v. Killingsworth,* 733 F.2d 1511 (11th Cir.1984), decided this date.

8. 20 C.F.R. § 727.203(b) provides that the presumption is rebutted if:

(1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

(2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

(3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or

(4) The evidence establishes that the miner does not, or did not, have pneumoconiosis.

9. During his deposition, Dr. Branscomb testified in part:

Q. Dr. Branscomb, in this case regarding Mr. Freeman, is it possible to distinguish in this case given all the physical results that you obtained in your examination, the chest x-ray, pulmonary function studies, his history and physical, is it possible to distinguish with any degree of medical certainty between a pulmonary disability from cigarette smoking or from coal dust exposure?
A. Yes.
Q. Do you believe there's [sic] sufficient facts in this case to make that distinction?
A. So that I can make that distinction? Yes.
Q. Do you have an opinion to the origin of Mr. Freeman's pulmonary problems?
A. Yes.
Q. What is that opinion?
A. It is caused by cigarette smoking and not caused by coal dust exposure.

erred in finding that the presumption had not been rebutted under 20 C.F.R. § 727.-203(b)(3). We agree with Drummond that the ALJ applied an improper legal standard in his consideration of Dr. Branscomb's testimony.

In *Blevins II*, the Board held that a physician's medical opinion offered to rebut an interim presumption of pneumoconiosis must be expressed in terms of a "reasonable degree of medical certainty" before that opinion may be considered by an ALJ in rebuttal. The Seventh Circuit has specifically rejected the "reasonable medical certainty" standard. *Peabody Coal Co. v. Lowis*, 708 F.2d 266 (7th Cir.1983); *Underhill v. Peabody Coal Co.*, 687 F.2d 217 (7th Cir.1982). The *Underhill* court explained that the Department of Labor cannot establish a standard that treats the same proof differently depending on which side offers it. Because claimants are permitted to invoke the pneumoconiosis presumption merely on the basis of "the documented opinion of a physician exercising reasoned medical judgment," 20 C.F.R. § 727.-203(a)(4), mine operators must be permitted to rebut the presumption under the same standard. 687 F.2d at 223. The *Underhill* court held that a physician's opinion, expressed in clear and uncontradicted terms and based on a physical examination, a ventilatory study, chest x-rays, and a review of the miner's employment history satisfied the "reasoned medical judgment" standard. *Id.* at 223. In *Lowis*, the court found that a physician's clear and uncontradicted opinion based on a review of the miner's employment history and a thorough examination satisfies the "reasoned medical judgment" standard. 708 F.2d at 274.

Furthermore, the Board recently has held: "To the extent that *Blevins II* re-

quired a medical opinion to satisfy the standard of a 'reasonable degree of medical certainty,' we overrule the decision. It is sufficient that a doctor's opinion constitutes a reasoned medical judgment." *Blevins v. Peabody Coal Co.*, —— BLR —— (BRB No. 81–2085 BLA, Dec. 21, 1983).

Therefore, because the ALJ applied an incorrect standard, we remand to the ALJ to consider the rebuttal evidence of Dr. Branscomb and the other doctors under the "reasoned medical judgment standard." [10]

For the foregoing reasons, the Board's decision is VACATED and the case is ordered REMANDED for proceedings not inconsistent with this opinion.

---

Dr. Branscomb then explained the facts upon which his opinion was based. Also, on cross-examination, Freeman testified that he had smoked a pack to a pack and a half of cigarettes a day for fifty years.

**10.** On remand, the ALJ should also consider "all relevant medical evidence" introduced for rebuttal under 20 C.F.R. §§ 727.203(b)(2) and (b)(4). For example, the ALJ gave Dr. Calix's

x-ray reading "significant evidentiary weight" as based on the most recent x-ray, taken April 4, 1984. In fact, however, Dr. Calix's reading was based on a March 14, 1984 x-ray. The same x-ray was reread twice by "B" readers who found it to be negative for pneumoconiosis. In addition, the ALJ credited Dr. Hamilton's ventilatory study as "substantially valid in form," failing to discuss that the Department of Labor found the study to be inadequate.