**TENNESSEE CONSOLIDATED COAL COMPANY, Petitioner,**

v.

**Clarence O. CRISP, and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

No. 87–3771.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 11, 1988.

Decided Jan. 19, 1989.

Ronald E. Gilbertson (argued), Kilcullen, Wilson & Kilcullen, Washington, D.C., Mary Lou Smith, for petitioner.

Nelson Layne, Tracy City, Tenn., Robert S. Peters, Winchester, Tenn., for Crisp.

Priscilla Anne Schwab (argued), Office of the Solicitor, U.S. Dept. of Labor, Washington, D.C., Thomas L. Holzman, Priscilla A. Schwab, Benefits Review Bd., U.S. Dept. of Labor, Washington, D.C., for respondents.

Before KENNEDY and WELLFORD, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

The Tennessee Consolidated Coal Company ("Company" or "Petitioner") petitions this court to review a final order of the Benefits Review Board ("Board" or "BRB") affirming an award of benefits under the Black Lung Benefits Act ("Act") to claimant Clarence O. Crisp. The Company now argues, as it did before the BRB, that the Administrative Law Judge ("ALJ") should have applied the permanent regulations in 20 C.F.R. Part 718 instead of the interim regulations in Part 727, and alternatively, that the ALJ erred in refusing to find rebuttal under 20 C.F.R. § 727.203(b)(3). We conclude that the ALJ did not err in applying the interim regulations in Part 727 to this claim, and that the ALJ's resolution of the factual dispute is supported by substantial evidence. Accordingly, we affirm.

Claimant Crisp was born on March 13, 1921. He worked in the Nation's coal mines from 1963 until 1979, and then filed this claim for Black Lung Benefits on November 20, 1979. Because Crisp's claim was filed before the effective date of the permanent regulations of Part 718 (March 31, 1980), the ALJ evaluated it under the interim regulations in 20 C.F.R. Part 727. *See* 20 C.F.R. §§ 718.2, 725.4(a) & (d). The ALJ credited Crisp with fifteen years em-

ployment as a "miner," 30 U.S.C. § 902(d), and therefore analyzed Crisp's claim under 20 C.F.R. § 727.203.

The ALJ invoked the interim presumption of total disability due to pneumoconiosis based upon two qualifying ventilatory studies, 20 C.F.R. § 727.203(a)(2), and then proceeded to review the evidence for rebuttal under section 727.203(b). The evidence indicated that Crisp suffered from a severe obstructive pulmonary impairment that totally disabled him from any type of employment, thus precluding rebuttal under subsections (b)(1) and (b)(2). *Id.* § 727.203(b)(1) & (2). In addition, the ALJ considered the medical opinions of Drs. Gilley and Mitchell, and found them insufficient to establish that Crisp's disability did not arise "in part" from his occupational coal dust exposure, *id.* § 727.203(b)(3), or that Crisp did not suffer from pneumoconiosis, *id.* § 727.203(b)(4). The ALJ therefore awarded benefits to Crisp. On appeal, the Board rejected the Company's contentions that the Part 727 regulations are inapplicable to this case and that the ALJ erred in not finding rebuttal under subsection (b)(3), and accordingly affirmed. The Company timely petitioned this court to review the BRB's decision.

## I.

■ Petitioner's first contention on appeal challenges the decision by the ALJ and the BRB to evaluate Crisp's claim under the interim regulations of 20 C.F.R. Part 727. The Company contends that the final regulations in Part 718 must be applied here, and that remand is therefore in order. Petitioner initially supported its claim for retroactive application of Part 718 by relying on the six month time limit in section 421(c) of the Act for promulgating final regulations. *See* 30 U.S.C. § 931(c). In *Youghiogheny and Ohio Coal Co. v. Warren,* 841 F.2d 134 (6th Cir.1987), however, we held that section 421(c) controlled only final regulations promulgated pursuant to Part C of the Act. *Id.* at 136. Because the regulations in 20 C.F.R. Part 718 were promulgated under Part A of the Act, *see* 30 U.S.C. § 902(f)(1)(D), the six month peri-

od in section 421(c) was not relevant. *Warren,* 841 F.2d at 136.

Petitioner now relies on section 411(b) in Part B the Act, which imposes on the Secretary of Health and Human Services the following requirement:

> *Final regulations required for implementation of any amendments to this subchapter* shall be promulgated and published in the Federal Register at the earliest practicable date after the date of enactment of such amendments, and *in no event later than the end of the fourth month* following the month in which such amendments are enacted.

30 U.S.C. § 921(b) (emphasis added). The Company argues that section 411(b) is also binding on the Secretary of Labor through section 430, which states that amendments "to part B of this subchapter shall, to the extent appropriate, also apply to this part [Part C]." 30 U.S.C. § 940. Petitioner thus contends that the Secretary of Labor should have promulgated the final regulations in Part 718 within four months after the month in which its enabling statute became effective. The Black Lung Benefits Reform Act of 1977 ("Reform Act"), which authorized Part 718, became effective on March 1, 1978; the Company therefore concludes that the final regulations should have been promulgated no later than July 31, 1978. More importantly, the Company interprets the four month promulgation requirement as Congress' mandate to the Secretary of Labor to apply the final regulations in Part 718 to all claims filed after expiration of the four month period, including the instant case, regardless of when the regulations were actually promulgated.

The Secretary of Labor, on the other hand, drafted the regulations to apply prospectively only, *see* 20 C.F.R. §§ 718.2, 725.4(d) & 727.2(d), and the Benefits Review Board has on several occasions upheld the Secretary's action, *see, e.g., McFarland v. Peabody Coal Co.,* 8 B.L.R. 1–163 (B.R. B.1985); *Smith v. National Mines Corp.,* 7 B.L.R. 1–803 (B.R.B.1985). We conclude that the Secretary's reading of the Act is reasonable; under the statute and its legis-

lative history, incorporation of the four month promulgation requirement in section 411(b) to mandate retroactive application of the Part 718 regulations is not "appropriate." 30 U.S.C. § 940. Accordingly, the final regulations in Part 718 may be applied strictly in a prospective fashion.

Initially, we find persuasive authority in the enabling statute to support the Secretary's decision to apply the interim regulations in Part 727 to all claims filed before the final regulations became effective. Both sets of regulations derive from the 1977 Reform Act. *See* Act of March 1, 1978, Pub.L. No. 95–239, § 2(c), 1978 U.S. Code Cong. & Admin.News (92 Stat.) 95–96, *codified at* 30 U.S.C. § 902(f); 20 C.F.R. § 718.1(a). The final regulations in Part 718 were promulgated pursuant to Congress' mandate that

> the Secretary of Labor, in consultation with the Director of the National Institute for Occupational Safety and Health, shall establish criteria for all appropriate medical tests under this subsection which accurately reflect total disability in coal miners as defined in [30 U.S.C. § 902(f)(1)(A) ].

30 U.S.C. § 902(f)(1)(D). Congress also directed the Secretary of Labor, however, to issue the interim regulations now found in Part 727 to control

> *any claim filed on or before the effective date* of regulations promulgated under this subsection by the Secretary of Labor [*i.e.,* the final regulations in Part 718]; ... whether or not the final disposition of any such claim occurs after the date of such promulgation of regulations by the Secretary of Labor.

30 U.S.C. § 902(f)(2)(C) (emphasis added). Congress thus decided that the Part 727 regulations would apply to "any claim filed on or before the effective date" of the final regulations. *Id.* To eliminate any remaining doubt, the statute further provided that the interim regulations would control "whether or not the final disposition of any such claim occurs after the date" that the final regulations became effective. *Id.* § 902(f)(2). These provisions clearly authorized the Secretary of Labor to apply prospectively the final regulations in 20 C.F.R. Part 718.

The Company nonetheless asserts that section 411(b), when applied to the Secretary of Labor through section 430, indicates that Congress intended a result contrary to this clear statutory language. We find nothing in those sections, however, evidencing Congress' intent to apply the four month limitation in section 411(b) to the Secretary of Labor. Sections 411(b) and 430 were both added to the Act by the Black Lung Benefits Act of 1972. *See* Act of May 19, 1972, Pub.L. No. 92–303 §§ 4(d), 5(10), 1972 U.S.Code Cong. & Admin.News 189, 191. At the same time, however, Congress also enacted a provision specifically controlling the Secretary of Labor's promulgation of final regulations under Part C—the six month requirement at issue in our *Warren* decision. *Id.* § 5(5), 1972 U.S. Code Cong. & Admin.News 190; *see Warren*, 841 F.2d at 136. Congress thus simultaneously enacted separate provisions with distinct timing requirements to control the regulatory actions fo each Secretary. Under these circumstances, we cannot accept the Company's argument that Congress intended the procedural limitations in section 411(b) also to apply to the Secretary of Labor.[1]

---

1. In addition, the Company's incorporation argument appears inconsistent with the language of the statutes. First, incorporating section 411(b) into Part C would arguably subject the Secretary of Labor to two conflicting time limitations when promulgating final regulations under Part C—the four month period in section 411(b), 30 U.S.C. § 921(b), and the similar six month limitation directly applicable to Part C in section 421(c), *id.* § 931(c); *see Warren*, 841 F.2d at 136. Petitioner argues in reply that the six month requirement would "obviously" control any regulations required by Part C, while the four month requirement in section 411(b) would remain applicable to cases such as this, in which the Secretary of Labor promulgates regulations under Part A. The Company effectively argues, therefore, that the four month requirement applies to the Secretary of Labor *only* when promulgating regulations under Part A of the Act. This result, however, is very difficult to reconcile with the statutory language. Section 411(b) applies the four month requirement to final regulations promulgated under "any amendments" to the Act, not just amendments under Part A. 30 U.S.C. § 921(b).

We find further support for this conclusion in the legislative history of the 1972 Act. Although the history does not explicitly address whether section 430 incorporates the timing requirement of section 411(b) into Part C, we find the following explanation instructive:

### Application of Part B to Part C

New section 430 requires that amendments to part B be applied, wherever appropriate, to part C. Existing law requires that State workmen's compensation laws conform substantially to the 1969 Act as interpreted by regulations of the Secretary of Health, Education and Welfare. This provision would further strengthen the intent expressed in existing law.

Questions were raised during the Committee deliberations over whether the amendments to part B would automatically be applicable, where appropriate, to part C.

Under the language of the existing law, the *standards* to be applied by the Secretary of Labor in administering part C or by a State workmen's compensation agency in adopting a program "which provides adequate coverage for pneumoconiosis," must not only be "substantially equivalent to or greater than the amount of benefits prescribed" in part B, but also "The *standards* for determining death or total disability due to pneumoconiosis" must be "substantially equiva-

lent" to those under the Federal part of the program.

Although it would appear clear that the *same standards* are to govern, the Committee concluded that it would be best to so specify.

It is contemplated by the Committee, that the *applicable portions* of following sections of part B, as amended, would apply to part C: section 411, section 412 (except the last sentence of subsection (b) thereof), section 413, and section 414.

S.Rep. No. 743, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin. News 2325 (emphasis added). Relying on the reference to section 411 in the last quoted paragraph, the Company contends that the four month requirement in section 411(b) is incorporated into Part C.[2] The reference to specific statutory sections, however, is explicitly limited to their "applicable portions." *Id.; see also* 30 U.S.C. § 940 (Part B incorporated only "to the extent appropriate"); Conference Rep. No. 1048, 92d Cong., 2d Sess., Amendment No. 46, *reprinted in* 1972 U.S.Code Cong. & Admin.News 2341 ("new section 430 to apply all *appropriate* amendments in Part B to Part C"). Whether a provision is "applicable" or incorporation is "appropriate" must be determined in conjunction with the previous paragraphs, which we believe show only Congress' intent that the Secretary of Labor (as well as any State workers' compensation law) must apply "sub-

---

Moreover, application of section 411(b) to regulations promulgated only under Part A is also contrary to the terms of section 430, which incorporates provisions of Part B only into Part C, and makes absolutely no mention of Part A. *Id.* § 940. We decline to embrace an interpretation so at odds with this statutory language.

**2.** The Company also directs our attention to a two-sentence "summary" of section 430 in the legislative history, which reiterated that provisions in Part B are incorporated into Part C only "to the extent appropriate," but then went on to state that "all amendments to Part B except the social security offset provision and the transition provision ... apply to Part C." *Legislative History of the Federal Coal Mine Health and Safety Act of 1969 (Public Law 91–173) as Amended Through 1974, including Black Lung Amendments of 1972,* Committee Print, 94th Cong., 1st Sess. (1975) at 2137 (Reprinting Con-

gressional Record—Senate, May 23, 1972). This cursory "summary" of section 430, however, is an insubstantial statement when compared with the detailed discussion of the statute, as well as the relationship between Parts B and C, in the Senate Report quoted in the text. In addition, the "summary" makes no explicit reference to incorporating procedural requirements, and it attempts no explanation of the conflicting requirements that such incorporation would foist on the Secretary of Labor. *Compare* 30 U.S.C. § 921(b) *with id.* § 931(c). Finally, the "summary" offers no support for the Company's assertion that section 411(b) should apply to the Secretary of Labor only when promulgating regulations under Part A, a result we have found inconsistent with the statutory language. *See supra* note 1. We conclude, therefore, that the material quoted in the text is a more persuasive indication of congressional intent.

stantially equivalent" standards as used in Part B for determining total disability due to pneumoconiosis and appropriate benefits. *Id.* No mention is made of Congress' intent to apply the procedural requirements in Part B to Part C. The provisions of Part B that Congress intended to apply to Part C, therefore, are those substantive standards defining total disability and the resulting benefits. *See, e.g.,* 30 U.S.C. §§ 921(c) & 922. Because the four month promulgation requirement in section 411(b) of the Act is not such a provision, we hold that it is not incorporated into Part C. Accordingly, we reject the Company's argument for mandatory retroactive application of Part 718.[3] Since Crisp's claim was filed well before the effective date of the Part 718 regulations, the ALJ properly considered it under the interim regulations in Part 727.

## II.

Although the ALJ considered and rejected all of the rebuttal provisions in 20 C.F.R. § 727.203(b), the Company challenges only the refusal to find rebuttal under subsection (b)(3), which provides:

The presumption in paragraph (a) of this section shall be rebutted if ... [t]he evidence establishes that the total disability or death of the miner did not arise in whole or *in part* out of coal mine employment.

*Id.* § 727.203(b)(3) (emphasis added). This court has considered rebuttal under subsection (b)(3) on several occasions, and we have held that the provision

grants the employer the chance to prove that the miner's disability did not arise, in whole or in part, from his coal mine employment. If an employer is able to prove that pneumoconiosis played *no part* in causing the miner's disability,

then the employer has satisfied the requirement of section 727.203(b)(3). Where, however, pneumoconiosis is a *contributing cause* to a miner's total disability, he is conclusively entitled to benefits.

*Gibas v. Saginaw Mining Co.,* 748 F.2d 1112, 1120 (6th Cir.1984) (emphasis added), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *see Wright v. Island Creek Coal Co.,* 824 F.2d 505, 508 (6th Cir.1987); *Roberts v. Benefits Review Board,* 822 F.2d 636, 638–39 (6th Cir.1987); *Moseley v. Peabody Coal Co.,* 769 F.2d 357, 361 (6th Cir.1985); *Ramey v. Kentland Elkhorn Coal Co.,* 755 F.2d 485, 491–92 (6th Cir.1985) (employer must prove that "sole" cause of miner's disability was other than pneumoconiosis).

The ALJ considered the medical evidence in the record and held that the Company failed to prove that Crisp's totally disabling respiratory impairment did not arise "in part" from his coal mine employment. Petitioner does not dispute that Crisp suffers from a totally disabling lung disease. Rather, the Company contends that the ALJ improperly interpreted the medical testimony and held the Company to an "impossible" standard to disprove causation under subsection (b)(3). We disagree.

■ We must of course affirm the ALJ's factual determination if it is supported by substantial evidence. *See Wright,* 824 F.2d at 507. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). At the same time, however, we must review the ALJ's decision to determine that the ALJ did not overstep his bounds in reviewing the medical evidence.

---

**3.** We recognize that this conclusion, along with our prior decision in *Warren,* means that the Secretary of Labor's promulgation of the Part 718 regulations under Part A of the Act was not constrained by any time limitation. The Company maintains that this could not have been the result envisioned by Congress. We note, however, that at no time during the regulatory process and the various comment periods did any interested party, including Petitioner, assert

that the Secretary was violating the enabling legislation by not promulgating the Part 718 regulations within four months of the 1977 Reform Act. Moreover, we find no indication in the history of the 1977 Reform Act that Congress intended the final regulations authorized by section 402(f)(1)(D) to be promulgated in any specific time period. Since it took the Secretary most of two years to develop the regulations, Congress' action appears wholly justified.

A testifying physician need not express his conclusions in terms of a "reasonable degree of medical certainty" to be credited by the ALJ; the ALJ must instead accept a "documented opinion of a physician exercising reasoned medical judgment." *Moseley*, 769 F.2d at 360. Although this standard necessarily restricts the ALJ's discretion to reject uncontradicted or unequivocal medical testimony, *see Underhill v. Peabody Coal Co.*, 687 F.2d 217, 222 (7th Cir.1982), it does not deprive the ALJ of his essential fact-finding function when medical testimony is conflicting or otherwise in dispute: "Determinations of whether a physician's report is sufficiently documented and reasoned is a credibility matter left to the trier of fact." *Moseley*, 769 F.2d at 360; *see Director, O.W.C.P. v. Rowe*, 710 F.2d 251, 255 (6th Cir.1983).

The evidence in dispute here is the opinion testimony from two physicians, Drs. Gilley and Mitchell, who each examined Crisp. Dr. Mitchell's written report noted Crisp's history of smoking one pack of cigarettes per day for forty years, and the results of a physical examination. The doctor diagnosed "Severe obstructive and bullous emphysema *presumably* only related to smoking" (emphasis added). Dr. Mitchell also checked the "No" box in response to the question whether, in his opinion, "the diagnosed condition related to dust exposure in the patient's coal mine employment." Finally, he assessed Crisp's impairment as "severe."

■ The ALJ rejected Dr. Mitchell's opinion as grounds for finding rebuttal under (b)(3):

> Dr. Mitchell *presumed* that Claimant's obstructive impairment and emphysema were related only to smoking. It appears that, based on this presumption, Dr. Mitchell checked the box on the medical form indicating that Claimant's condition did not arise out of coal dust exposure. Dr. Mitchell's presumption is not of sufficient medical certainty to be creditable. Accordingly, his conclusions as to the origin of Claimant's respiratory impairment do not rebut the presumption pursuant to 20 C.F.R. § 727.203(b)(3).

(emphasis in original) (citation omitted). We believe that this conclusion was well within the ALJ's province as fact finder, and we reject Petitioner's contention that the ALJ improperly substituted his medical judgment for that of Dr. Mitchell. In questioning Dr. Mitchell's "presumption" that Crisp's disability was "only related to smoking," the ALJ did no more than inquire whether the doctor's report was "sufficiently documented and reasoned," a credibility decision we have expressly left to the ALJ. *See Moseley*, 769 F.2d at 360. Since the doctor's "presumption" was nowhere explained, we hold that the ALJ's decision to reject Dr. Mitchell's causation conclusion as unreasoned was supported by substantial evidence.

■ The testimony of Dr. Gilley presents a slightly more difficult question. Crisp told Dr. Gilley of his smoking history, shortness of breath, fatigue, and chronic cough. Dr. Gilley conducted a physical examination and other medical tests. He diagnosed "chronic obstructive pulmonary disease, severe." His discussion in his written report of Crisp's condition is especially pertinent:

> The patient's major problem is chronic obstructive lung disease. *In all probability* the cigarette smoking is a *major* etiological factor. Air pollution in the coal mines *may have contributed* [to] or aggravated the development of lung disease. The patient is considered disabled for any type of occupation because of chronic obstructive lung disease. There is very little, if any, objective evidence of coal workers' pneumoconiosis.

(emphasis added).

Dr. Gilley expanded on his conclusions in deposition testimony. The doctor stated that Crisp had "severe chronic obstructive pulmonary disease or what is commonly known as emphysema." Dr. Gilley again discussed the cause of Crisp's disability:

> Q: Doctor, do you have an opinion within a reasonable degree of medical certainty as to whether or not Mr. Crisp is disabled because of pneumoconiosis?
>
> A: I don't think you could put it on that basis. I think he's disabled because of

chronic obstructive pulmonary disease, and I think that no one could 100 percent say what percentage or what degree of his exposure to atmospheric pollutions in the coal mine contributed to these changes in the lungs. I would guess that if you were liberal you would say probably no more than 10 percent of the changes in the lungs could be attributed to the atmospheric pollution.

Q: In other words, Doctor, is it your opinion that at least 90 percent of Mr. Crisp's emphysema was due to other factors besides the mine, such as cigarette smoking?

A: Most likely the cigarette smoking.

The question was then revisited on cross-examination:

Q: What contribution would the coal mine environment have to Mr. Crisp's emphysema if Mr. Crisp had had emphysema to a lesser degree? What effect would the coal mine environment [have] had upon that condition?

A: Well, this is, you know, I've already alluded to this. I think that by all reasonable odds the *major contributing factor* to his degree of chronic lung disease, primarily obstructive lung disease, he may first be predisposed or certain individuals who are predisposed to developing this with a greater degree and frequency in the same atmosphere, and some other individual may not. That's a known fact. But cigarette smoking, and if, indeed, he was exposed to welding fumes in a closed area, that could have played a role. I think coal dust in itself does not cause lung scarring as a rule, and there's not enough change on the x-ray that would lead me to believe that coal dust per se played a *significant role*. Even if you gave him the benefit of the doubt, maybe 10 percent or something like that. I don't know. That would be a guess.

Q: All right. But there could be that 10 percent contribution?

A: Possible, yes.

(emphasis added).

From these statements, it is fair to conclude that Dr. Gilley found Crisp's ciga-

rette smoking to be the "major" cause of his disability, but that the doctor did not rule out exposure to coal dust as a "contributing factor." In the ALJ's words:

Dr. Gilley stated that *probably* cigarette smoking was a major cause of Claimant's respiratory impairment. He went on to state that air pollution in the mines may have contributed to or aggravated the development of Claimant's lung disease. He wasn't sure what percentage of Claimant's lung problems was attributable to coal mine exposures, but *guessed* at no more than ten (10) percent. He also stated that welding fume exposure in a closed area could have contributed to the problem.

Dr. Gilley's testimony establishes that Claimant's lung impairment did arise in part out of coal mine employment. Therefore, it does not serve as rebuttal under 20 C.F.R. § 727.203(b)(3).

(footnote and citation omitted) (emphasis in original). In view of Dr. Gilley's original diagnosis that coal dust "may have contributed" to Crisp's disabling pulmonary disease and his subsequent deposition testimony to the same effect, the ALJ correctly held Dr. Gilley's opinion insufficient to rule out occupational coal dust exposure as a "contributing cause" to Crisp's respiratory disability. *See Gibas*, 748 F.2d at 1120. Under the standard for (b)(3) rebuttal set forth in our prior cases, therefore, we hold that the ALJ's refusal to find rebuttal under section 727.203(b)(3) was supported by substantial evidence.

Petitioner objects to this conclusion, however, arguing that it imposes an impossible burden on the employer to disprove causation when the miner's disability takes the form of a respiratory or pulmonary disease. Echoing Dr. Gilley's testimony, the Company asserts that no doctor can determine causation in such cases with 100% accuracy. The Company then deduces from this assertion that we should not read section 727.203(b)(3) literally to require that coal dust be shown to play "no part" in the miner's total disability, *see Gibas*, 748 F.2d at 1120, a standard ostensibly beyond medical expertise when the miner suffers from

a lung disease, but that rebuttal should be allowed under subsection (b)(3) if the medical evidence shows that coal dust exposure is not a "significant" or "substantial" cause.

We cannot agree, however, that the literal application of subsection (b)(3) in the instant case renders rebuttal under that provision "impossible" as Petitioner suggests. The regulations, of course, do not require medical testimony to be given in terms of 100% certainty.[4] We have interpreted the regulations to permit rebuttal where the physicians's conclusions satisfy the much more lenient standard of a "documented opinion of a physician exercising reasoned medical judgment." *Moseley*, 769 F.2d at 360. Petitioner gives us little reason to conclude that medical doctors are unable to satisfy this standard in establishing the cause of a miner's pulmonary or respiratory disease. Indeed, the Company in its brief has cited us to cases in which a doctor has testified that the claimant's disability was "clearly and unequivocally due to [claimant's] cigarette smoking and not his coal mine employment." *Peabody Coal Co. v. Lowis*, 708 F.2d 266, 276 (7th Cir. 1983); *see also Welch v. Benefits Review Board*, 808 F.2d 443 (6th Cir.1986) (two physicians state that claimant's pulmonary disease unrelated to coal dust exposure; rebuttal allowed under (b)(3)); *Drummond Coal Co. v. Freeman*, 733 F.2d 1523 (11th Cir.1984) (remand for ALJ to consider similar expert testimony under proper standard); *cf. Underhill v. Peabody Coal Co.*, 687 F.2d 217 (7th Cir.1982) (finding similar medical testimony sufficient to prove (b)(4) rebuttal).

We do not believe that Dr. Gilley's inability to offer a similarly unequivocal opinion on causation here is sufficient reason to depart from the clear regulatory language in subsection (b)(3) and our precedent interpreting that provision. This is not, as the Company claims, a case in which the doctor merely recognized on cross-examination the theoretical possibility of an alternative cause of the disability. Rather, in his original diagnosis of Crisp's condition, Dr. Gilley explicitly stated that "Air pollution in the coal mines may have contributed or aggravated the development of lung disease." Although in his deposition testimony Dr. Gilley tried to put the best possible light on this conclusion, he merely concluded that Crisp's x-ray did not show that "coal dust per se played a significant role" in the lung disease—a conclusion strongly implying that the x-ray did show some effects of coal dust exposure.[5] We agree with the ALJ and the Board that this testimony does not satisfy the Company's burden of proving that Crisp's disability did not arise "in part" from coal dust exposure. Under these circumstances, rebuttal under subsection (b)(3) is not appropriate.

## III.

Accordingly, the decision of the Benefits Review Board is AFFIRMED.

WELLFORD, Circuit Judge, dissenting.

My disagreement with the majority opinion is not with its analysis of the tangled procedural situation in this case regarding the applicability of the interim regulations

---

4. Dr. Gilley's statement concerning the inability to determine causation with 100% accuracy may be explained in part by the fact that it was given in response to a question by *Petitioner's* counsel asking for the doctor's "opinion within a reasonable degree of medical certainty," a standard we have specifically rejected.

5. It appears that the proper avenue for rebuttal in cases where the claimant's disability is arguably not "significantly" related to coal dust is 20 C.F.R. § 727.203(b)(4), which permits rebuttal of the miner did not have pneumoconiosis. "Pneumoconiosis" is defined in section 727.202 as "a chronic dust disease of the lung and its sequelae, including respiratory or pulmonary

impairments, arising out of coal mine employment.' In addition, the regulation states: *"For the purposes of this definition,* a disease 'arising out of coal mine employment' includes any chronic pulmonary disease resulting in respiratory or pulmonary impairment *significantly* related to, or aggravated by, coal dust exposure in coal mine employment." *Id.* § 727.202 (emphasis added). Because Petitioner chose not to appeal the ALJ's denial of rebuttal under (b)(4) to either the BRB or this court, we express no opinion whether the evidence before the ALJ was sufficient to require rebuttal under subsection (b)(4).

in Part 727 of the Black Lung Benefits Act. Rather, I dissent from part II of the opinion because I believe Tennessee Consolidated Coal Company (TCC) did rebut the presumption applicable to Crisp under the statute by reason of rebuttal provisions in 20 C.F.R. § 727.203(b)(3).

The Administrative Law Judge (ALJ) held that TCC failed to prove that Crisp's disabling respiratory ailment did not arise from his coal mine employment.[1] I believe that medical evidence in this case establishes by "reasoned medical judgment" that Crisp's condition arose from his persistent heavy cigarette smoking not by reason of coal mine employment. Dr. Mitchell indicated by checking the box on the form provided him that the "diagnosed condition" of emphysema did *not* relate "to dust exposure in the patient's coal mine employment." He had earlier indicated that this condition related "presumably" *only* to smoking. The ALJ and the Board therefore improperly rejected Dr. Mitchell's opinion after an examination of Crisp; it was "of sufficient medical certainty" not only to be credible but set out that the origin of Crisp's condition was not due to coal mining conditions of employment. In my view, *Moseley v. Peabody Coal Co.*, 769 F.2d 357 (6th Cir.1985), is not a basis of support for claimant's position, nor authority to ignore Dr. Mitchell's opinion.[2]

Dr. Gilley conducted a thorough examination and made tests on Crisp before concluding that Crisp's "major problem is chronic obstructive lung disease," which he attributed to cigarette smoking as the "major etiological factor." He found "little, if any, objective evidence of coal workers' pneumoconiosis." Dr. Gilley amplified his report by deposition testimony about Crisp's condition of emphysema, and he made a direct response that he was not disabled because of pneumoconiosis. Giv-

ing the claimant the *"benefit of doubt,"* on cross examination, Dr. Gilley felt that there may have been "maybe 10 percent ... *possible* contribution" of coal mine "environment" on Crisp's condition. For all practical purposes, absent a hypertechnical reading of the proof, this medical testimony would be sufficient to establish rebuttal under 727.203(b)(3).

To hold otherwise under the proof in this case is to utilize a literal, unrealistic reading of the regulation and to ignore practical realities. I agree with TCC that use of this type of approach imposes an almost impossible burden upon the employer to disprove even insignificant or minimal causation. *Gibas v. Saginaw Mining Co.*, 748 F.2d 1112, 1120 (6th Cir.1984), held, among other things, that "[T]he Black Lung Benefits Act requires payment of benefits only for total disability *due to pneumoconiosis."* (emphasis added) It later indicated that pneumoconiosis must be shown by the claimant to be a "contributing cause" of the claimed total disability. *Id.* at 1120. That coal mine environmental conditions may possibly have brought about Crisp's emphysema is not enough to establish entitlement.

I would find that TCC rebutted the interim presumption in this case. It should not be called upon to demonstrate with 100% accuracy that coal mine environment could not possibly have been a factor in an emphysema case where there is "little, if any, objective evidence of pneumoconiosis."[3]

I therefore respectfully dissent.

---

1. There is no dispute but that Crisp suffers from a totally disabling respiratory condition.

2. *Moseley* held for the employer on whether coal mine exposure was a "contributing cause" for disability despite evidence from five physicians that claimant suffered from pneumoconiosis.

3. According to the decision of the Deputy Commissioner in this case, the only other doctor referred to in the record, Dr. W.S. Cole, "denies the existence of Pneumoconiosis." The Deputy Commissioner found that Crisp had "emphysema, not pneumoconiosis ... relatable to his many years of cigarette smoking."